[S. F. No. 10934. In Bank.—April 29, 1926.]

## HERMAN FROST, Appellant, v. ALPHEUS L. HANSCOME et al., Respondents.

[1] CONSPIRACY—WHAT CONSTITUTES—LIABILITY—PARTIES.—In a conspiracy there must be a concert of action between two or more persons to accomplish an unlawful purpose, or a lawful purpose by unlawful or fraudulent means; and when the purpose of the conspiracy is accomplished, each participant in the wrongful act is responsible as a joint tort-feasor for all damages ensuing from the wrongful act.

[2] JUDGMENTS—ACTION TO SET ASIDE—FRAUD—EQUITY.—Equity will not afford relief against a final judgment unless extrinsic fraud and a meritorious defense be both alleged and proved.

[3] ID.—INSUFFICIENCY OF EVIDENCE—NONSUIT.—In this action to annul two judgments and compel the surrender of certain pledged securities and for damages, it is held that neither the facts standing alone nor any rational inferences to be drawn therefrom were sufficient to support a judgment for the plaintiff upon the allegations of the complaint, and that a nonsuit was properly granted.

(1) 6 **C. J.**, p. 702, n. 81 New; 12 **C. J.**, p. 542, n. 5, p. 543, n. 20, p. 610, n. 38, p. 611, n. 40, p. 639, n. 90, p. 646, n. 97; 27 **C. J.**, p. 50, n. 20, p. 68, n. 25, p. 69, n. 30. (2) 34 **C. J.**, p. 442, n. 27, p. 443, n. 28, p. 489, n. 18, p. 494, n. 88, p. 495, n. 89, p. 496, n. 14, 19. (3) 34 **C. J.**, p. 496, n. 10, 14, p. 497, n. 37.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. James M. Troutt, Judge. Affirmed.

The facts are stated in the opinion of the court.

I. I. Brown, Samuel T. Bush and L. Seidenberg for Appellant.

J. R. Cunnyngham for Respondent Alpheus L. Hanscome.

J. E. White, N. J. Barry and J. R. Cunnyngham for Respondents.

1. See 5 Cal. Jur. 495; 5 R. C. L. 1061.
2. See 15 Cal. Jur. 36, 38; 15 R. C. L. 735, 762.

SHENK, J.—The plaintiff brought this action to annul two judgments obtained against him by the defendants Wood and Turner, respectively; also to compel the surrender of certain securities pledged by him to the said defendants; also for $30,000 actual damages and additional damages in the sum of $20,000 by way of punishment.

The complaint charges the defendants with fraud in obtaining said judgments and with a conspiracy to abstract from him his money and property by fraud and deceit. At the conclusion of the plaintiff's case defendants moved the court for a nonsuit on the ground that there was no evidence to show a conspiracy or fraud on the part of any of the defendants and that there was no evidence to show that the plaintiff in any way lost any money or suffered any damage. The motion was granted, and from a judgment in favor of defendants the plaintiff appeals. The only question presented on the appeal is whether the trial court was justified under the evidence in granting the motion for a nonsuit.

For some twenty years the plaintiff, Herman Frost, had been engaged in the sheep-raising and ranching business in eastern Oregon. In 1915 he removed with his accumulated savings to San Francisco, where he engaged in the saloon and cafe business at No. 920 Market Street. In 1916 he became acquainted with Milton S. Hamilton, who was made a party defendant in this action, but was never served with process. Hamilton was an attorney at law and represented Frost in numerous actions and other matters during the course of several years. Hamilton early acquired the habit of borrowing money from Frost and of recommending that he loan money to others, among whom was Patrick L. Flanigan, a real estate operator residing in Reno. Acting on the advice of Hamilton, Frost loaned Flanigan various sums aggregating, in March, 1917, the sum of $6,000, which was repaid in the manner presently to be related.

The defendant Sallie C. Turner was the owner of a grain and livestock ranch in the Surprise Valley, in Modoc County, consisting of 2,580 acres of land, which she and her husband had acquired during the course of twenty years' residence in that locality. Her son, Raymond Turner, since 1913 had been leasing 740 acres of the ranch on a lease from year to year. On December 1, 1916, the defendant

Charles E. Wood, a real estate dealer and promoter, entered into a written lease with the Turners, husband and wife, covering 2,044 acres of the ranch for a term of five years from the fourth day of January, 1917, on a rental of one-half of the crops and one-half of the increase of the live-stock. Wood also owned a contract to purchase the Hedg-peth ranch, located three miles south of the Turner ranch. Flanigan was an acquaintance of Hamilton and through the influence and advice of the latter aroused the interest of Frost in the purchase of the Turner ranch. Frost made a trip to the ranch in September, 1917. On that trip he met Flanigan, Wood, and Mrs. Turner. After spending several hours on the ranch and examining it in a superficial way, so he claims, and after conversations between Frost, Flani-gan, and Wood, it was agreed that they would purchase the Turner ranch, take the title thereto and operate the same in the name of a corporation thereafter to be formed under the laws of the state of Nevada and to be called the Surprise Valley Land & Livestock Company. The documents pre-paratory to the incorporation and organization of the com-pany were shortly thereafter prepared by the defendant Hanscome, who had practiced law in an eastern state, but had not been admitted to practice in this state. Hanscome was an acquaintance of Hamilton and on a prior trip to Modoc County had met Mrs. Turner and the defendant Wood. After negotiations for the purchase of the ranch had been concluded it was agreed between Flanigan, Wood, and Frost that a contract of purchase should be entered into with Mrs. Turner, that Flanigan should be the nominal pur-chaser and that he should thereafter assign the contract of purchase to the proposed corporation. Wood was to sur-render his lease on the Turner ranch and transfer his con-tract of purchase covering the Hedgpeth ranch to the cor-poration. Frost was to advance $10,000 in cash as the first payment on the purchase price of the Turner ranch and receive the corporation's note for $10,000 in consideration of such advancement. The three were to share equally in the capital stock of the corporation, which was to consist of 100 shares of the par value of $100 each.

The Surprise Valley Land & Livestock Company was in-corporated in October, 1917, and upon organization Flani-gan was elected president, Wood secretary, and Frost treas-

urer of the company. The capital stock was issued as agreed. Wood surrendered his lease on the Turner ranch and transferred to the corporation his interest in the Hedgpeth ranch. By the agreement of purchase and sale, which bears date January 4, 1918, Mrs. Turner agreed to convey to Flanigan the 2,580 acres of land in the Turner ranch free and clear of all encumbrances and a miscellaneous lot of farm machinery, tools, and equipment used in the operation of this extensive ranch. The agreement also covered the purchase of livestock consisting of 70 head of mules, 31 head of horses and brood mares, 250 head of cattle, 175 hogs, 58 sheep, one jack, and a half interest in a French Percheron stallion. The purchase price was $219,385, $10,000 payable on the execution of the contract, $10,000 on the first days of November, 1918, 1919, 1920 and 1921, respectively, and $58,-692.50 on the first day of November, 1922, after which payments Mrs. Turner agreed to convey title to the real property, execute a bill of sale of the personal property and take a note or notes for the balance of the purchase price secured by a mortgage on the premises. On the day of its date the contract of purchase was assigned by Flanigan to the corporation. Frost did not advance the first payment of $10,000 on the contract as he agreed to do under the arrangement between the three men, but insisted that Flanigan pay thereon the said $6,000, owed by Flanigan to Frost, plus interest on the same. After considerable negotiation the sum of $6,500 was paid by Flanigan to Mrs. Turner in discharge of his indebtedness to Frost and the latter paid to Mrs. Turner the balance of the first payment on the contract, to wit, the sum of $3,500. Under date of December 5, 1917, Frost received the corporation's note for $10,000 on account of his agreed advancement of the initial payment. The corporation entered into possession and commenced farming operations. In order to finance the enterprise the corporation made application for a loan to the Fort Bidwell Bank. To carry on his operations under his lease Wood had theretofore obtained a credit at that bank of $5,000, of which he had drawn $1,000. The bank agreed to loan the company $5,000 provided the $1,000 was paid. The company accordingly executed a note to the bank for the sum of $5,000 and $4,000 was placed to its credit. The obligation of Wood to the bank, which was extinguished in that

transaction, was included in the terms of the sale by Wood of his interest in the company to Frost. In the latter transaction Wood surrendered his stock in the company and received two promissory notes signed by Frost and Flanigan, one in the sum of $7,000 and the other in the sum of $2,000. The $7,000 note was transferred by Wood to Mrs. Turner in partial satisfaction of his indebtedness to her, her son Raymond, and her daughter on account of money loaned to him in operating the ranch under his lease and before the advent of Frost on the scene. This note was not paid when due, whereupon Mrs. Turner commenced an action in the superior court in and for the county of Modoc against Frost and Flanigan and on the default of Frost to appear within the time prescribed by law a default judgment was entered against him in the sum of $8,393.50. Later on Frost moved the court to set aside the default and permit him to answer and upon a denial of that motion took an appeal from the judgment. The judgment was affirmed (*Turner* v. *Frost,* 51 Cal. App. 196 [196 Pac. 290]). On proceedings supplementary to execution and on what must be conceded to have been questionable advice on the part of Hamilton, Frost failed to appear, whereupon he was cited for contempt and upon his failure to appear was arrested and taken before the court. He was released on $1,000 bail pending the determination of his application to set aside the default. Frost paid $400 on the $2,000 note held by Wood and on his default in the payment of the balance Wood commenced an action against him in the city and county of San Francisco. It does not appear that he had any defense to that action, but through the negligence of his attorney, Hamilton, so Frost alleges, a default judgment was obtained against him for the sum of $1,848.97. The foregoing judgments are sought to be set aside and annulled in this action.

On June 10, 1919, H. Raymond Hall, as assignee, and for the benefit of Frost, commenced an action against Wood in the superior court of the city and county of San Francisco for $3,333.33, as the alleged proportionate share of Wood's stockholders' liability on the note for $10,000 issued to Frost by the livestock company. On the same day Frost commenced an action against Wood in the same court to enjoin the defendant therein named from enforcing his judgment against Frost. In that complaint Frost recited the pendency of the action filed on the same day, entitled

*Hall* v. *Wood,* and sought to establish an equitable set-off against Wood to the extent of the latter's alleged stockholders' liability. In both of the actions last mentioned Hamilton appeared as attorney for the plaintiff. Shortly thereafter a settlement of all the differences between Mrs. Turner, Wood, and Frost was proposed. To that end, and under date of June 17, 1919, an agreement in writing was executed by them and witnessed by their respective attorneys. In this agreement it was recited that Mrs. Turner held the judgment for $8,393.50 against Frost in Modoc County, that Wood held the judgment for $1,848.97 against Frost in the city and county of San Francisco and the pendency of the actions of *Frost* v. *Wood* and *Hall* v. *Wood* in said city and county. In this compromise agreement Frost agreed to pay at the time of the execution thereof the sum of $750 in partial satisfaction of the judgment in the action of *Turner* v. *Frost* and the further sum of $750 in partial satisfaction of the judgment in the case of *Wood* v. *Frost.* In addition, Frost agreed to pay Mrs. Turner and Wood the further sum of $8,085.72, being $671.75 less than the balance due on said judgments, on or before August 16, 1919, and Mrs. Turner and Wood agreed to accept the reduced amount in full satisfaction of their claims provided said payments should be made when agreed. As security for his performance of the agreement Frost assigned and transferred to Mrs. Turner and Wood three promissory notes owned by him, aggregating $12,100, with a stipulation that if he should fail to make the payment on August 16, 1919, the said securities should be sold to satisfy said judgments, any balance remaining to be paid to Frost. It was further agreed that proceedings of any kind or nature in all of said actions should be suspended to and including the sixteenth day of August, 1919. In conclusion the said agreement of compromise provided as follows: ''This agreement is intended and is hereby declared to be a full and complete settlement of all claims of whatsoever character or nature that Charles E. Wood and Sallie C. Turner now have or ever have had against Herman Frost and all claims of every character and nature that Herman Frost now has or ever has had against Charles E. Wood or Sallie C. Turner and upon a compliance with the terms and conditions of this agreement in the manner and at the times herein specified will be a full release and discharge of all

such claims.'' In negotiating this compromise agreement the parties thereto were represented by their respective attorneys, Mr. J. E. White representing the defendants Turner and Wood, and Milton S. Hamilton representing Herman Frost.

Frost failed to make the payment due August 16, 1919, and nearly two years thereafter, to wit, on July 5, 1921, commenced the present action to annul said judgments, cancel the assignments and compel the surrender of said securities on the ground of fraud and deceit.

The agreement for the purchase of the Turner ranch contained a provision that on or before the first day of March of each year the purchaser should execute a chattel mortgage on the crops of that year in the sum of $10,000 as security for the payment of the ensuing installment of the contract price. Early in the year 1918 it was foreseen by Flanigan, who was in the actual charge of the ranching enterprise, that it would be impossible to raise the necessary money for such operations if the chattel mortgage due March 1, 1918, were executed. In lieu of the requirements of the contract and with Mrs. Turner's acquiescence Flanigan caused his wife to hypothecate certain laundry stock owned by her for the sum of $10,000 and deposited the same in the First National Bank of Alturas in the place and stead of the required chattel mortgage. For default of the purchaser in making further payments on the contract price Mrs. Turner repossessed the ranch in February, 1919, and about two months thereafter commenced an action against the bank to recover the deposit made in lieu of the chattel mortgage. That suit was compromised and in the settlement Mrs. Turner received the sum of $4,000 in cash. Before she repossessed her property she had received $14,030 on account of payments required by the contract of purchase, which was much less than she would have received had the contract been complied with. The livestock company had taken the 1917 and 1918 crops from the ranch and had removed $10,000 worth of produce and other property from the Hedgpeth ranch. Frost as treasurer of the livestock company received as returns from the ranches from December, 1917, to November, 1918, the sum of $17,951.30, and out of his own funds he paid out in financing the enterprise the sum of $18,008.15, including the $10,000 for which he received the company's note as reimbursement.

The foregoing is an outline of the principal transactions disclosed by the plaintiff's evidence. Upon these facts, and additional matters hereinafter adverted to, he predicates his inferences that the defendants were acting in concert with a design to separate him from his money and property by fraudulent means.

[1]   In a conspiracy there must be the concert of action between two or more persons to accomplish an unlawful purpose, or a lawful purpose by unlawful or fraudulent means (*Parkinson* v. *Building Trades Council,* 154 Cal. 581, 593 [16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550, 98 Pac. 1027]).   When the purpose of the conspiracy is accomplished each participant in the wrongful act is responsible as a joint tort-feasor for all damages ensuing from the wrongful act (*Revert* v. *Hesse,* 184 Cal. 295 [193 Pac. 943]).   Unlawful concerted purpose and action is charged by the plaintiff against Flanigan, Turner, Wood, Hanscome and Hamilton.   It appears that Flanigan died before the commencement of this action, which accounts for the fact that he was not made a party defendant herein.   His actions, however, are called in question and concerning them it must be said that his participation in the enterprise appears to have been entirely consistent with his good faith and that no reasonable inference of bad faith on his part may be drawn from the evidence.   All of the money which he borrowed from the plaintiff was repaid.   In order to safeguard the contract of purchase acquired by the livestock company, two-thirds of whose stock the plaintiff was the owner, Flanigan caused the laundry stock of his wife to be hypothecated for a loan of $10,000 to be used in satisfying the requirements of the contract of purchase.   It would be unreasonable to suppose that if he were actuated by a purpose to defraud the plaintiff he would risk $16,500 of the funds of himself and wife in endeavoring to carry on the enterprise.   This amount together with his own time and energy appear to have been wholly lost.

Concerning Mrs. Turner's part in the transaction, it appears beyond question that she was dealing at arm's-length with Flanigan and Frost and her codefendants herein.   She was represented at all times by an attorney whose conduct appears to have been diligent in her behalf.   She made no representations as to the value of the ranch.   The fact that some stranger to the transaction told Frost after the pur-

chase that "he had paid too much for the ranch" was not competent evidence of misrepresentation on her part nor was it evidence that the ranch and personal property sold were not worth what was agreed to be paid for the same. Frost was a ranchman and on his first visit to the Turner ranch he stated, in the presence of Mrs. Turner in response to an inquiry as to what he thought of the ranch, that he had made his money ranching and could see the possibilities of the Turner ranch. The fact that the Turners had theretofore sold the ranch or thought they had and had been compelled to take back the property was not sufficient proof of misrepresentation nor does it give rise to a rational inference that the transaction was permeated with fraud. Mrs. Turner was the owner of a large ranch. Her husband had recently died and she desired to sell. She placed upon the ranch a price which the purchasers agreed to pay. There is no evidence that the agreed price was not the reasonable price of the property. The corporation went into possession and remained in possession for more than a year and when it failed to fulfill its agreement she terminated the lease.

As to the defendant Wood: He was in possession of the Turner ranch and personal property under a lease beginning January 4, 1917, with an unexpired term of four years. He also owned a contract to purchase the Hedgpeth ranch, from which about $10,000 worth of produce and other personal property was removed by the livestock company while it was in possession of the same. For his interest in both ranches Wood received one-third of the capital stock of the corporation. This stock he sold to Frost for $10,000, taking his promissory notes to the extent of $9,000, the corporation assuming an indebtedness of Wood to the extent of $1,000. There is no evidence to show that Wood's interest in the ranches which was transferred to the corporation was not worth all he received for the same. The plaintiff stresses the fact that under date of January 4, 1918, an agreement was entered into between Mrs. Turner and Wood whereby Wood was to receive for and on account of his surrender of his lease and his participation in the sale theretofore consummated the sum of ten per cent of the contract price when the same should be paid. The plaintiff insists that this contract is an indication of conspiracy as between Mrs. Turner

and Wood to defraud him. The contract is somewhat am-
biguous, but it is reasonably susceptible to the construction
and the undisputed evidence supports the contention that
under it Wood was to receive the said percentage as compen-
sation for surrendering his leasehold interest and thus per-
mitting the sale to become effective with right of immediate
possession in the purchaser.

From an examination of the record we find nothing to
support the contention of plaintiff that the defendant Hans-
come was guilty of any unfair dealing with the plaintiff or
with any of the parties to the transaction.

Concerning the conduct of the defendant Hamilton, it ap-
pears that he was acting as the attorney for Frost in all
actions and matters in which Frost was interested from a
time antedating the contract of purchase of the Turner ranch
until the final agreement of compromise was consummated.
There is sufficient in the record to indicate that he was lack-
ing in diligence in representing Frost in the cases of *Turner*
v. *Frost* and *Wood* v. *Frost,* as a consequence of which in-
convenience and embarrassment were suffered by Frost in
being cited for contempt in response to a citation to appear
before the superior court of Modoc County to be examined
as a judgment debtor, but it does not appear that he had
any meritorious defense to either of said actions. The diffi-
culties in which Frost found himself from time to time appear
under the evidence to have been attributable to his failure
to discharge his obligations at the time appointed in his
agreements. [2] Equity will not afford relief against a
final judgment unless extrinsic fraud and a meritorious de-
fense be both alleged and proved (*Amador C. & M. Co.* v.
*Mitchell,* 59 Cal. 178; *Sohler* v. *Sohler,* 135 Cal. 323 [87
Am. St. Rep. 98, 67 Pac. 282]; *Silva* v. *Santos,* 138 Cal. 542
[71 Pac. 703]; *Parsons* v. *Weis,* 144 Cal. 417 [77 Pac. 1007]).
Assuming that the allegations of the complaint herein were
sufficient, the proof fell far short of establishing either re-
quirement. The proof must be sufficient to raise more than
a mere conjecture or surmise. "It must be such that a
rational, and well-constructed mind can reasonably draw
from it the conclusion that the fact exists, and when the
evidence is not sufficient to justify such an inference," the
court may and should grant a motion for a nonsuit (*Janin*

v. *London & S. F. Bank,* 92 Cal. 14, 27 [27 Am. St. Rep. 82, 14 L. R. A. 320, 27 Pac. 1100]).

[3]    From a consideration of the record we are satisfied that neither the facts standing alone nor any ·rational inferences to be drawn therefrom were sufficient to support a judgment for the plaintiff upon the allegations of the complaint. The trial court therefore properly granted the motion for a nonsuit.

The judgment is affirmed.

Lennon, J., Waste, C. J., Curtis, J., Richards, J., Seawell, J., and Lawlor, J., concurred.