## SOUTHERN PAC. CO. v. LIBBEY.

No. 13078.

United States Court of Appeals
Ninth Circuit.

Oct. 1, 1952.

342

Arthur B. Dunne, Dunne, Dunne & Phelps, San Francisco, Cal., for appellant.

Daniel V. Ryan, Thomas C. Ryan, Ryan & Ryan, San Francisco, Cal., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

Libbey brought this action against the Southern Pacific Company to recover damages for injuries received by him at a time when he claimed that he was an employee of the Company and entitled to the benefits of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.[1] The appeal is from a judgment in his favor.

At the time in question Libbey was in the Company's roundhouse at Roseville, California. Two days previously he had become a student fireman with the understanding that he would be a student for two weeks, after which, if he qualified, he would go on regular pay. As soon as he was given his first instructions at the superintendent's office, which included a lecture on rules,

---

[1] An additional claim included in the original complaint asserting rights under the Federal Boiler Inspection Act, 45 U.S.C.A. § 23, was dismissed.

and regulations and the use of care, he was told to report to the master mechanic who sent him to the roundhouse foreman. At the latter's direction, he followed employees who were lighting fires in locomotives. The first day Libbey did nothing but follow these firelighters and lighted no fires himself. On the next day he followed the same firelighters about the roundhouse and he himself lighted fires on two different locomotives. On this day, before Libbey's shift had terminated, the firelighters had finished lighting all the fires that were required and one of them told Libbey "just to stand around and watch and pick up whatever you can learn, can't help you anymore; we have lit all the fires and the engines are ready." Libbey was then standing in a corner looking around when one Petersen, an engine hostler, came by and told Libbey that he, Petersen, was going to move an engine. According to Libbey, Petersen asked him if he would like to go with him. Libbey climbed into the cab of the engine with Petersen and took his place on the fireman's side of the cab while Petersen sat on the engineer's seat. Libbey said he was merely watching Petersen to see what he could learn. When Petersen started to back the locomotive there was a flashback of fire into the cab, which was due to the fact that the fire box door had been left open and the draft which followed the moving of the throttle drove the fire into the cab. It is conceded that the leaving of the door open was negligence chargeable to the company. The fire cut off Libbey's opportunity to escape. He was in danger of being burned and he jumped out of the cab window to the concrete floor some 12 feet below and in doing so fractured the femur of his right leg, thus receiving the injuries for which he sought recovery in this action.

Appellant's specifications of error fall into two groups. In one category are the contentions, first, that as a matter of law Libbey was not, at the time of his injuries, an employee within the meaning of the Federal Employers' Liability Act, and second, that in any event, he was not engaged in interstate commerce within the meaning of the Act. If appellant were to prevail upon

either of these two contentions, it would be entitled not only to a reversal but to a dismissal of the action. Specifications in the other category relate to alleged errors in the exclusion of evidence offered, and in the refusal of proposed instructions, as well as a specification relating to the size of the verdict.

The court submitted to the jury the question of whether, under the instructions, Libbey was an employee of the Company. Appellant asserts that it was error to leave this to the jury, that there was no evidence to show that the relation of master and servant existed.

When Libbey was sent to the roundhouse foreman he was handed two sheets of paper which were printed forms to be signed at the end of each sheet. These forms were headed "Authority to pass and instruct student". One of them, bearing date of Libbey's first day as a student, was introduced in evidence and was apparently executed and signed on that day by the roundhouse foreman. On the first line is inserted Libbey's name, the statement that the occupation referred to is that of fireman, and the date. Below this, in print is the following: "Please see that student is thoroughly instructed in the duties of the position named, and impress upon him the importance of thoroughly acquainting himself not only with the duties of that position but of any other with which he may be intrusted, or to which he may aspire. The necessity for carefulness, courtesy, reliability, loyalty and honesty should be pointed out, as well as the advantages that will accrue from his getting along pleasantly with his fellow-workers. At conclusion of student's trips with you, please fill out and sign the following report and forward it to my office. (Place for signature) Title ......." Following this are inserted with pen and ink the date, the shift, (3 to 11 p. m.), the word "firelighter", and under the printed words "Opinion for fitness for position", the word "learning". When Libbey came to the foreman the latter instructed him to keep his eyes and ears open and "learn everything I could about being a fireman". It was then that he was told to follow the firelighters.

It was argued that under these circumstances Libbey could not be held to be an employee. It is said this result follows not only because he was not instructed to perform any services, but also because his being in the cab of the locomotive was no part of what he had been instructed to do.

We think that it cannot be said that as a matter of law there was insufficient evidence to warrant the jury in finding that Libbey was in fact an employee of the company at the time of his injuries. The case of Watkins v. Thompson, D.C., 72 F. Supp. 953, reviews substantially all of the cases relating to the question of when a person in the position of student fireman, or student brakeman, or other similar student position, is an employee within the meaning of the Employers' Liability Act. Both parties have cited that case with approval and are in agreement that it correctly summarizes the tests to be applied in such cases. Measured by the rules there set forth, the evidence here was sufficient to establish the fact of employment and the relationship of master and servant within the meaning of the Act.[2]

Appellant contends that of the cases cited in the Watkins case, those in which the plaintiff was held an employee were cases in which the student was actually performing some work. Here, appellant says, although it appears that Libbey did light some fires, he was not told to do so, and hence he must be deemed to have done that as a volunteer and as an experiment for his own benefit. We think that it would be improper to take so strict a view of this evidence. The jury could properly infer from the evidence that the work of lighting the fires was not only the natural and normal thing for a learner to do, but that it was done with the consent and approval of those in whose charge he had been placed.

As for the contention that the employment had ceased when the fires had all been lighted on the day in question, it is to be noted that Libbey's shift had not then been terminated. He was not wholly unwarranted in assuming that a part of what he was supposed to do was to watch what was going on and see what he could learn by observation. This would be a fair interpretation of the statement in the form quoted above to the effect that Libbey was to thoroughly acquaint himself with the duties of the position of fireman. The roundhouse foreman had also told him "to keep my eyes and ears open and learn everything I could about being a fireman." The jury reasonably could believe that Libbey was in the cab in order to learn what he could "about being a fireman."

Appellee contends that the decisions upon this matter go so far as to hold that the student learning by observation only is performing work for the benefit of the railroad. Certainly something may be said for that view. While the obtaining of instruction is for the benefit of the student it is also something which is for the benefit of the railroad. In applying the test as to "whose work was being performed at the time of the injury", it could, perhaps, be said that the mere learning by observation was a part of the railroad's work. It is essential to the continuation of the company's business that it provide instruction and training for new employees.

We find it unnecessary in this case to go so far. Here, as in the other cases cited in the Watkins case, supra, Libbey had on the day in question actually done some work in that he had lighted fires himself. The fact that he did not replace any of the regular firelighters is of no significance. If, as we think cannot be questioned, Libbey was actually an employee while he was

2. 72 F.Supp. at page 955: "And the Supreme Court has held that the term 'employee' in the Employers' Liability Act describes the conventional relation of master and servant. Robinson v. Baltimore & Ohio R. Co., 237 U.S. 84, 35 S. Ct. 491, 59 L.Ed. 849; Hull v. Philadelphia & R. R. Co., 252 U.S. 475, 40 S.Ct. 358, 64 L.Ed. 670 * * *. This relation is usually dependent upon the right to direct the manner in which the work should be done. * * * or, stated differently, its existence is determined by ascertaining whose work was being performed at the time of the injury."

going about after the firelighters and lighting fires, it must follow that he was still an employee when, after the lighting was terminated he stood and looked about him. Once it has been shown that a claimant under the Act has become an employee, he does not lose his character as such when he leaves his precise place of work and does other acts which are incidental to his employment, even although the latter acts may not involve pulling levers, swinging picks, or lighting fires. Thus it has been held that a fireman did not cease to be an employee when he left his engine, which he had just prepared to depart for a run, and walked across the tracks in order to go to his boarding house. North Carolina R. R. v. Zachary, 232 U.S. 248, 260, 34 S.Ct. 305, 309, 58 L.Ed. 591.[3] In Chicago, M., St. P. & P. R. Co. v. Kane, 9 Cir., 33 F.2d 866, 868, this court held that a newly employed track workman who had "not yet lifted a pick or stuck a shovel into the ground", who before breakfast was struck and killed while he was crossing tracks in an "angling" direction from the bunk car where he slept to the toilet, was "in appellant's employ, and his service was interstate." A similar decision was Mostyn v. Delaware, L. & W. R. Co., 2 Cir., 160 F.2d 15, in which it was held that a track worker who was injured while sleeping on the ground outside of a bunk car was "employed" and entitled to the benefits of the Act. The same principle was applied to a student flagman in Huntzicker v. Illinois Cent. R. Co., 6 Cir., 129 F. 548.[4]

It does not aid appellant to say that when Libbey moved himself from the corner where he was watching roundhouse operations to the engine cab he mistook and misinterpreted his instructions. An employee does not cease to be one merely because of any such misinterpretation or mistake. We therefore conclude that it cannot be said that as a matter of law Libbey was not an employee.

The record sufficiently shows that Libbey was an employee in interstate commerce within the meaning of the Employers' Liability Act.[5] It was testified that on the day in question Libbey lighted a fire on a Mallet engine and a fire on a switch engine. It is to be inferred from the evidence also that on each day he accompanied the regular firelighters as they lighted the fires in all of the engines in the roundhouse in which fires were to be built. The roundhouse then housed Mallet engines and also "44 hundreds", which latter were passenger engines. The Mallets were a type of engine used for mountain service between Roseville and Sparks, Nevada. Roseville itself was a junction point where the trains on the system were broken up and the cars moved into other trains, dependent upon

---

3. "Again, it is said that because deceased had left his engine and was going to his boarding house, he was engaged upon a personal errand, and not upon the carrier's business. Assuming (what is not clear) that the evidence fairly tended to indicate the boarding house, as his destination, it nevertheless also appears that deceased was shortly to depart upon his run, having just prepared his engine for the purpose, and that he had not gone beyond the limits of the railroad yard when he was struck. There is nothing to indicate that this brief visit to the boarding house was at all out of the ordinary, or was inconsistent with his duty to his employer. It seems to us clear that the man was still 'on duty,' and employed in commerce, notwithstanding his temporary absence from the locomotive engine."

4. That was a common law action for negligence in which the defense was under the fellow servant rule. The student was traveling on a freight train to his trainmaster's station to be examined. With the consent of the conductor, who was also in the caboose, he laid down and took a nap. While he was sleeping he was killed by a rear end collision. Recovery was denied on the ground that he was a fellow servant of the employees who caused the collision.

5. The Act as amended in 1939 provides as follows: "Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter." § 51, Title 45.

whether they were going north into Oregon or east into Nevada. The engine in which Libbey was sitting when he jumped was one about to be moved to another track for use that evening in operating to a place called Bowman Turn to pick up cars known as "reefers" (refrigerator cars) which carried fruit and vegetables into Roseville for transfer to other trains, some of which, the witness Petersen testified, went to Oregon.

As we understand the appellant's argument, the Act even in its amended form applies only to employees who are engaged in the furtherance of interstate *transportation,* or work "so closely related to transportation" as to be practically a part of it. It is argued that nothing with which Libbey had to do was concerned with transportation either immediately or remotely.

■ It is well settled that roundhouse employees working on cars and engines being prepared for use in interstate hauls are within the definitions of the Act. Shelton v. Thomson, 7 Cir., 148 F.2d 1, 3; Edwards v. Balt. & O. R. Co., 7 Cir., 131 F.2d 366, 369; Cf. Baird v. N. Y. Cent. R. Co., 299 N.Y. 213, 86 N.E.2d 567; Trucco v. Erie R. Co., 353 Pa. 320, 45 A.2d 20, certiorari denied 328 U.S. 843, 66 S.Ct. 1023, 90 L.Ed. 1618; Southern Pac. Co. v. Industrial Accident Comm., 88 Cal. App.2d 569, 199 P.2d 364.

It is true that the foundation for the testimony by Petersen and Libbey that the Mallet engine in which he built a fire was one used to haul freight over the mountain to Sparks, Nevada, was not as strong as it might have been. It may be conceded that better informed witnesses might have been called, but it was particularly within the power of appellant to produce evidence to show precisely where the Mallet engine was used. It furnished no testimony whatever upon the subject, and hence we are not impressed with the contention that there was a complete want of evidence that some part of Libbey's duties either directly or closely and substantially, affected interstate commerce.[6]

■ We hold therefore that the case was properly one for the jury.

That brings us to a discussion of those specifications which relate to alleged errors in the rejection of testimony and in the refusal of offered instructions. In our view, the most serious of these specifications is the one relating to the rejection of certain testimony sought to be elicited from a Dr. Cress who was the company's physician who examined Libbey at the time he was accepted as a student fireman.

At the time of his injury Libbey was 27 years of age. When he was 18, after two years of high school, he entered the Marine Corps in December, 1941. He served at Guadalcanal where he was wounded in October, 1943. He was struck by shrapnel which shattered the femur of the left leg. Bits of bone were removed and he was hospitalized until Christmas, 1944. He was on crutches when he was discharged from the Marine Corps in August, 1945, with a 70% disability rating. This disability was later cut to 35% and in August, 1950, when he became a student fireman he still had a 10% disability rating for which he was receiving compensation. In the latter part of 1947, when he was in employment as a seaman in the Army Transport Corps he fell from one deck to another deck of a vessel and fractured the knee of the previously injured leg, and for this second injury there was an extended period of hospitalization. In consequence of this knee injury he had trouble bending his knee. In August, 1948, he fractured his left wrist in an automobile accident, was hospitalized for six weeks and did not work until February, 1949. When he applied for employ-

---

6. The general rule relating to the inference to be drawn from the failure of a party to produce evidence is similar to one which has been codified in California. § 2061, Code Civ.Proc. provides: "That evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and, therefore, [T]hat if weaker and less satisfactory evidence is offered, when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

ment and was given the student fireman appointment, he made out written applications in which he falsely stated that he had graduated after four years of high school education; that he had never been injured; that he had never received a pension or disability rating from any government or organization, and that he had never been confined to a hospital for surgical operation or following an injury.[7]

Although the doctor who gave him a physical examination following his written application noted signs of injury, there was evidence from which the jury might well infer that the doctor was informed by Libbey that the scars and deformity were the result of a fracture during early childhood.[8] When the doctor was on the stand as a witness for the defendant he was asked a question which in substance was whether if he had known the facts which were concealed by the false answers he would have passed Libbey for a fireman.[9] The court sustained an objection to the question and the offered testimony was excluded. The court also sustained an objection to a further question as to whether a man with the history of the injuries sustained by Libbey and concealed in the application would meet the standards for physical condition that were set for acceptance of student firemen and for employment as a fireman. The objections were sustained on the ground that the matters thus inquired about were not the proper subject for expert testimony; that the testimony would result in opinion and conclusion which would be self-serving. Appropriate offers of proof were made.[10]

7. The evidence was sufficient to sustain a finding that the facts were as stated by appellant in the following summary contained in its brief: "1. To the question asking for his schooling (the school, location, time attended, whether graduated and major subject) he answered: 'Sylvan Grammar School, Citrus Heights, eight years; graduated, yes; major subject, grammar' and four years of high school and graduated. The statement as to high school education was false and he knew it. 2. To the question 'Have you ever been injured or suffered an amputation? If so, state how, when, where and the nature thereof', he answered 'No'. Obviously the answer was false and known to him to be false, and he finally conceded 'that was an untruthful answer? A. Yes sir'. 3. To the question 'Have you ever received a pension or disability rating from any government or organization? If so, give details' he answered 'No'. The answer was obviously false and known to him to be false. At the very time he was receiving disability payments from the United States. 4. To the question 'Have you ever been confined to a hospital for surgical operation or following an injury? If so, give details briefly' he answered 'No'. The answer was false and known to him to be false when he made it."

8. The doctor had no independent recollection of the examination but at the time of the examination he noted upon the application in his own handwriting "multiple scars left thigh and slight deformity of left thigh. Result of compound fracture of the femur during early childhood."

9. Because of the doctor's lack of independent recollection of Libbey, the question propounded was in the form of a hypothetical question.

10. Of course, if fraud was not an issue in the case, the rejection of this evidence would not be error, even although the objection to it was not on the ground that no such defense was in issue. It appears that the testimony with respect to the statements, and that they were false and known to be false, went in without objection that there was no issue of fraud made by the pleadings. See Fed.Rules Civ.Proc. rules 8(c) and 9(b) 28 U.S.C.A. Immediately following the selection of a jury, but before the taking of testimony, the court and counsel engaged in an extended colloquy with respect to a proposed amendment to the answer designed to eliminate the word "employ" from the answer as filed. The general import of the discussion by court and counsel was that the parties would pay little attention to the pleadings, one of the parties remarking that "it is almost a pre-trial conference". At that time there was no mention of a fraud issue. Without objection the court submitted to the jury the issue of whether Libbey's employment had been procured by fraud, and during the deliberations of the jury the court received from them the inquiry "Are we to take in consideration the fact that false statements were made on the application for employment in determining settlement?" to which the court, with the

■ It is not questioned by either side that one who procures his employment by fraud is not entitled to the benefits of the Employers Liability Act, Minneapolis &c. R. Co. v. Rock, 279 U.S. 410, 49 S.Ct. 363, 73 L.Ed. 766, providing the false statement was of such character that it "substantially affected the examining surgeon's conclusion that he was in good health and acceptable physical condition", Minneapolis &c. R. Co. v. Borum, 286 U.S. 447, 52 S.Ct. 612, 613, 76 L.Ed. 1218. It is plain that had the rejected testimony been received, the jury might well have found the existence of what some courts have referred to as a "causal" relation between the fraud and the injury in two respects. First, had the court permitted the appellant to prove by the doctor that the latter relied upon the truth of statements in passing Libbey, it is apparent that were it not for the false statements Libbey would not have been an employee and his injuries and this suit would not have resulted. Second, when Libbey jumped, because of his knowledge of his disabled left leg he purposely threw all his weight on the right leg and the fracture resulted.

■ The materiality of the misrepresentation is manifest. The duties of a fireman require both agility and stamina.

And while the doctor saw and observed the scars and partial deformity of the left thigh, yet the evidence indicates he had been told that this resulted from a fracture in early childhood. There is also evidence that the doctor was informed that Libbey was a war veteran.[11] A man who suffered a serious fracture in early childhood but who nevertheless had been accepted for military service would be a very different risk than a man who had received serious injuries in the service and but recently been given a medical discharge with 70% disability. Under these circumstances, the company was entitled to prove that its medical officer acted in reliance upon the false statements. The testimony which was rejected was appropriate for that purpose. Bernstein v. Gross, 5 Cir., 58 F.2d 154, 155.[12]

■ ■ The inquiry as to whether the doctor, if he had known the facts which were concealed, would have passed the man, was an appropriate way in which to inquire whether the examining physician relied upon the statements. We know of no exception to the rule that the plaintiff in an action for fraud or deceit may testify that he was induced to act as he did by the representations that were made or that he relied upon the false statements.[13] This rule has been

consent of counsel for both sides, replied: "The defense interposed by the defendant based upon alleged false statements made in the application for employment goes to the question of the liability of the defendant. It has no relationship to the matter of damages in the event the Jury should decide for the plaintiff."

It would appear therefore that whatever defect there may have been in the answer as filed, it would be deemed amended through the receipt, without objection, of the evidence of fraud. Liverpool & London & Globe Insurance v. Gunther, 116 U.S. 113, 6 S.Ct. 306, 29 L.Ed. 575; United States v. Anderson, 9 Cir., 70 F.2d 537; cf. Robinson v. F. W. Woolworth Co., 80 Mont. 431, 441, 261 P. 253, 257. And this issue must be treated as if it had been pleaded because it was thus tried by consent of the parties. Rule 15(b) R.C.P.; United States v. Cushman, 9 Cir., 136 F.2d 815, 817.

11. His written statement was that he was last attended by a physician "one year

ago Vets Hosp." He testified that this was the occasion when he broke his wrist.

12. "Carter's testimony that he relied on Bateman's represented connection with the business, and would not otherwise have parted with his money, is admissible evidence of a fact best known to himself." Citing 27 C.J. 58; see also 37 C.J.S., Fraud, § 109, p. 421.

13. "Plaintiff was permitted to testify that he was induced to buy the land by the representations that had been made to him that it was second bottom land, and never overflowed. While, in a sense, the answer is a conclusion of the witness, yet, under repeated rulings of this court, it was competent for the witness to testify as to what induced him to take the land." Bartlett v. Falk, 110 Iowa 346, 81 N.W. 602, 603.

"[T]he trial court erred in refusing to permit plaintiff to testify he believed and relied on the representations. Notwithstanding an objection that such testimony of plaintiff would amount to a conclu-

followed in California, Fagen v. Lentz, 156 Cal. 681, 105 P. 951, 954,[14] Luitweiler Pumping Engine Co. v. Ukiah Water & Imp. Co., 16 Cal.App. 198, 116 P. 707, 712; Harned v. Watson, 17 Cal.2d 396, 403, 110 P.2d 431, 435.[15]

This being the rule of evidence in the state where the trial was held, we must hold that the rejected evidence was admissible under Rule 43(a) R.C.P. Manifestly the rejection of this evidence was prejudicial error which requires a reversal with direction to grant a new trial.

In view of the fact that a new trial must be had, we consider it necessary to indicate our views with respect to other specifications presented on the appeal, and we shall do so as briefly as possible. Error is assigned in the refusal of the court to give the company's proposed instructions Nos. 22 and 23, which were designed to submit to the jury the question of whether, assuming that Libbey was an employee when he was with the firelighters, he had not departed from his employment when he climbed into the cab. The exceptions taken by defendant to the instructions were not to the failure of the court to give an instruction generally upon this subject but rather to the failure of the court to give the proposed Nos. 22 and 23 as requested.

■ Under the circumstances of this case, it is difficult for the court to perceive how a jury could conclude that when Libbey climbed into the locomotive he was "on a frolic of his own". It is well settled that servants often proceed under mistaken construction of their directions and that in so doing they do not necessarily depart from the course of their employment. Although a servant may make a deviation or detour from the strict line of his master's directions, and may do so in part to serve his own ends, yet such a detour or deviation does not necessarily amount to a departure. See Mechem on Agency, 2d Ed., §§ 1900 to 1912; Restatement of the Law of Agency, § 236. But if it be assumed that the jury might, on the evidence here, have concluded that Libbey's getting on the cab was so much a frolic of his own as to be a complete departure, yet we think that the proposed instructions, in the form in which they were drawn, were misleading. They omit all reference to the fact that Libbey was charged with the task of thoroughly acquainting himself with the duties of the position to which he aspired and that he was told to keep his eyes and ears open and learn everything he could about being a fireman. In our opinion too much emphasis is placed upon the fact that he may have gone upon the locomotive "for his own benefit and convenience and in his own interest." This well may have been one of Libbey's motives at the time but the motive may have been mixed with the further motive of carrying out his instructions to learn about his job. We are of the opinion that the court was not in error in rejecting these proposed instructions.

Error is assigned in the refusal of the court to admit in evidence the first paragraph and the signature only of a certain document headed "Application for Permission to Observe Operations of Locomotives, Cars and Trains". The document in ques-

---

14. "It was, of course, entirely proper to allow the plaintiff to testify that in making the deed of gift he relied upon 'Ellen's promise that, when the estate was settled, he would get his share back.' It was essential to his case that he had made the deed relying on and having confidence in his sister's promises, and his statement to that effect was competent evidence * * *."

15. (Seduction under promise of marriage.) The question was "Was it his promise that induced you to submit yourself for sexual intercourse?" The court said: "One of the essential elements to be established in the proof of seduction is reliance on the promise of marriage. The state of mind therefore is a fact to be proved, the best evidence of which is the testimony of the victim herself, such fact being peculiarly within her own knowledge."

sion of the witness-plaintiff, his belief of and reliance on the representations were facts peculiarly within his own knowledge and were hardly susceptible of direct proof in any other way." Steinger v. Smith, 358 Mo. 39, 213 S.W.2d 396, 399. Numerous additional cases to the same effect are listed in Wigmore on Evidence, 3d Ed. § 581, under footnote 3.

tion was signed by Libbey. The other paragraphs of the document contained a purported assumption of risk which would be void under the Employers' Liability Act. But appellant says that the first paragraph should have been received because it contained Libbey's signed agreement that he sought "permission to enter and ride upon the locomotives, trains and cars of said company for the purpose of observing the operations of the railroad of said company with the understanding that I shall be under no obligation to perform any work or service upon such railroad until employed by said company." It is said that this would be evidence tending to show that Libbey was not an employee.

We think that the fact that Libbey signed such a paper is wholly without significance; as it is a written instrument, its meaning and construction was for the court. The circumstances relating to Libbey's engagement as a student fireman were fully disclosed and what his relationship was, as a matter of substance, was before the court and jury. The books are full of illustrations of the proposition that ordinarily mere form must yield to substance. Hervey v. R. I. Locomotive Works, 93 U.S. 664, 673,[16] 23 L.Ed. 1003. Examples are found in the cases where an insurance company inserts in its policy an agreement of the policy holder that the company's agent shall be deemed the agent of the insured. Kausal v. Minnesota Farmers' Mut. Fire Ins. Ass'n, 31 Minn. 17, 16 N.W. 430.[17] As this court said in Watson v. Commissioner of Internal Revenue, 9 Cir., 62 F.2d 35, 36, quoting from Heryford v. Davis, 102 U.S. 235, 26 L.Ed. 160: "It is the legal effect which is to be sought for. The form of the instrument is of little account."

■ Appellant offered to prove a certain article of a so-called "Firemen's Agreement". It does not appear in the record what this agreement was, although we assume that it may have been an agreement between the company and the firemen's union. The paragraph offered contained the recital that after a fireman had finished his student period he would be on a 90 day probationary status. Libbey was not a party to any such agreement and we fail to perceive any reason for its receipt in evidence.

■ We also think that the court properly excluded an offer of Rule 864 of the company's transportation rules which recited that: "Persons must not be permitted to ride on an engine or in a baggage, mail or express car without a written order from the proper authority, except employees in the discharge of their duties and those holding transportation endorsed to that effect." Clearly under the rule employees when in discharge of their duties may ride on an engine. One question for the jury was whether Libbey was an employee in the discharge of his duties. For them to read the rule would not assist in the determination of this or any other question in the case.

While we have thus concluded that the specifications of error, other than those relating to the rejection of the doctor's testimony, are without merit, yet, for the reasons heretofore expressed with respect to the latter assignments, we hold that the judgment must be reversed and the cause remanded for a new trial.

16. "[N]o words employed by the parties can have the effect of changing the true nature of the contracts."

17. "After the courts had generally established this doctrine, many of the insurance companies, in order to obviate it, adopted the ingenious device of inserting a provision in the policy that the application, by whomsoever made, whether by the agent of the company or any other person, shall be deemed the act of the insured and not of the insurer. But, as has been well remarked by another court, 'there is no magic in mere words to change the real into the unreal. A device of words cannot be imposed upon a court in place of an actuality of fact.' "