[Civ. No. 22474.   Second Dist., Div. Two.   Dec. 18, 1957.]

JOSEPH PESKIN, Appellant, v. ARLO D. SQUIRES, Respondent.

*Assigned by Chairman of Judicial Council.

242

Wyman & Finnell for Appellant.

Gilbert J. Heyfron, Earl E. Howard and Charles F. Howard for Respondent.

ASHBURN, J.—Plaintiff appeals from judgment of non-suit in a fraud action. The complaint contains numerous counts, but the ninth, alleging fraud, is determinative of this appeal.

The familiar test of propriety of a nonsuit must be kept in mind. " 'A motion for nonsuit may properly be granted ". . . when, and only when, *disregarding conflicting evidence*, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.'' [Citations.] ■■ "Unless it can be said as a matter of law, that . . . no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury." ' " (*Seneris* v. *Haas*, 45 Cal.2d 811, 821 [291 P.2d 915, 53 A.L.R.2d 124].)

Appellant relies upon subdivision 3 of section 1572, Civil Code, which declares actual fraud to consist of "[t]he suppression of that which is true, by one having knowledge or belief of the fact" when done with intent to deceive, "or to induce him [plaintiff] to enter into the contract." ■ Section 1709, Civil Code, further provides: "One who *willfully deceives another with intent to induce him to alter his position to his injury or risk*, is liable for any damage which he thereby suffers." The Supreme Court explained in a footnote on page 488 of *Gagne* v. *Bertran*, 43 Cal.2d 481 [275 P.2d 15], that "[u]nder this section of the Civil Code the intent required to prove a cause of action for deceit is an intent to induce action. An 'intent to deceive' is not an

essential element of the cause of action, and statements in a number of cases, contrary to this section and the cases cited in the text, that such an intent is an essential element of deceit are erroneous and are therefore disapproved.'' The body of the opinion cites in support of the rule, *Gonsalves* v. *Hodgson*, 38 Cal.2d 91, 100 [237 P.2d 656]; *Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 422 [159 P.2d 958]; *Work* v. *Campbell*, 164 Cal. 343, 347 [128 P. 943, 43 L.R.A.N.S. 581], and other cases. This implies that in case of a willful suppression of a material fact the intention existing at the time of suppression need be only one of inducing action and that subsequent insistence upon the existence of the concealed fact, to the damage of the plaintiff, completes the actual fraud.

The alleged concealment consists of failure of defendant to reveal to plaintiff the fact that certain receivables sold by M. E. Wright Lumber Company to plaintiff and purporting to be debts of defendants were fictitious, unenforceable as to defendant and known by him to be such.

Applying the quoted rule governing nonsuits, the record at bar by direct evidence and reasonable inferences makes a showing of the following facts:

Plaintiff, doing business as Aetna Factors Company, is engaged in factoring accounts receivable in the sense of buying same for his own account from vendors of various commodities. On March 4, 1954, he made a contract with M. E. Wright Lumber Company to ''buy at the net face amount of invoices all accounts receivable created by its sales'' of lumber. Defendant Squires was one of Wright's customers, being engaged in buying and selling of lumber. Before making the contract with the Wright Company plaintiff investigated M. E. Wright and his company as to financial ability and reputation and found same satisfactory. Wright applied to plaintiff for an extension of credit to Squires and he in turn was investigated with satisfactory results; a $25,000 line of credit was approved for him by plaintiff. Wright then tendered to plaintiff for purchase certain schedules of accounts, each of which contained the introductory statement: ''THIS IS TO CERTIFY, That the parties named below are indebted to the undersigned in the sums set opposite their respective names, for personal property sold and delivered or for work and labor done''; names and addresses of ''debtors,'' invoice dates, numbers and amounts, with terms and discount were then listed. The

document concludes with the words, "the undersigned hereby sells, transfers and assigns to Aetna Factors Company, its successors or assigns, all its right, title and interest in and to the accounts receivable, notes, trade acceptances, contracts, merchandise and/or other evidences of indebtedness above named including all monies due or to become due upon the same." With this schedule were submitted invoices in triplicate, attached to each of which were a "delivery ticket" and a "shipper's ticket" or "trucker's ticket" acknowledging receipt of the merchandise by the consignee.

Plaintiff in nine instances purchased receivables represented by invoices thus submitted which showed, or purported to show, sales of lumber by the Wright company to defendant Squires. The first purchase was made on March 10, 1954, and the last on March 29, 1954. Three of the invoices (Nos. 8020, 8021 and 8081), totaling $3,902.25, were paid by defendant, the lumber covered thereby having been actually delivered to him. But the other six (Nos. 8022, 8066, 8085, 8093, 8094 and 8101), aggregating $16,594.16, were never paid, the asserted reason being failure of the Wright company to deliver any of the lumber described therein. But there was no real failure of consideration, for there was no such sale as the invoices showed.

A course of business had arisen between the Wright company and Squires prior to the time that plaintiff began to buy Wright receivables. The Wright company was in need of money and it was agreed between Wright and Squires that in instances where receivables were sold to Wright's factor (then Gibson Factors, preceded by Industrial Factors), without any delivery of lumber, Squires and Wright would exchange checks when payment of the voucher became due,—thus Squires would be out no money and Wright would have the use of the factor's money meantime (for the factor paid Wright as soon as the assignment of the receivable was delivered to it) ; in other words, Wright was thus given a fictitious credit and an appearance of working capital which it did not possess. It appears at bar that the trucker's tickets purporting to show receipt of the goods by the consignee were signed in the name of D. Young, but this was done by M. E. Wright, there being no trucker in fact. The Wright company went into bankruptcy but the date of same does not appear in the record.[1]

---

[1] This evidence of the course of dealing between the Wright company and Squires seems to have been stricken, which was error. It should

This same method of handling fictitious invoices was pursued after plaintiff became the Wright company's factor, but it was not disclosed to plaintiff, who believed that the invoices were genuine and that the receivables represented by them had grown out of actual delivery of lumber to defendant.

Appellant's counsel insists that defendant was bound to make a disclosure of the fact that the vouchers were fictitious and his failure to do so worked a fraud on appellant. Defendant's attorneys argue that no such duty rested upon defendant, who merely received notices of assignment of invoices, had no inquiries from plaintiff, did not discuss the matter with him or his representative, and therefore did nothing to induce action on plaintiff's part.

It may be conceded *arguendo* that a debtor who receives notice of assignment of his account may treat it merely as an effort to fix priority as to other assignees, and that ordinarily he is not called upon to do anything other than to respect the notice of assignment when the time for payment arrives or good cause for nonpayment accrues. But this is not the ordinary case, for the assignments here under discussion embraced nonexistent debts, fictitious vouchers emanating from an agreement between defendant and Wright company that the latter might sell such nonexistent receivables to its factor and make good by payment of money to Squires instead of delivery of lumber. ▮ While the debtor normally need say or do nothing affirmative when he receives notice of assignment of his debt, it is fair to assume that one who owes nothing and receives notice of an assignment of an alleged debt owing from him will forthwith notify the assignee that there is no such outstanding obligation. In this instance defendant tacitly agreed to keep quiet in such circumstances, thus assuring success of Wright's imposition upon his factor. ▮ Defendant knew that Wright company was engaged in selling receivables to plaintiff which were fictitious and that Wright was expressly or impliedly representing them to be valid; that no lumber had been or would be delivered to defendant and that he would not pay the invoice unless Wright exchanged checks with him, thus taking up the invoice himself. Clearly, this was fraudulent conduct on the part of Wright, and being done pursuant

---

have remained in the record. But the result is the same whether this be considered as prejudicial error (*Morrison* v. *Mutual L. Ins. of N.Y.*, 15 Cal.2d 579, 590 [103 P.2d 963]) or the evidence be considered as a part of the basis for testing the propriety of the nonsuit.

to agreement with defendant it was what the law denominates as a conspiracy. ■ "A conspiracy is a combination of two or more persons to accomplish by concerted action a criminal or unlawful purpose, or a lawful purpose by criminal or unlawful means. . . ." (*J. F. Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581, 593 [98 P. 1027, 16 Ann. Cas. 1165, 21 L.R.A.N.S. 550].) Accord: *Frost* v. *Hanscome,* 198 Cal. 550, 557 [246 P. 53]; *Clark* v. *Lesher,* 106 Cal.App. 2d 403, 409 [235 P.2d 71]. ■ Each party to a conspiracy is liable for all acts done in pursuance thereof and his lack of knowledge of details or an absence of personal commission of overt acts is immaterial. (*Wells* v. *Lloyd,* 6 Cal.2d 70, 82 [56 P.2d 517]; *Mox Incorporated* v. *Woods,* 202 Cal. 675, 677 [262 P. 302]; *California Auto Court Assn.* v. *Cohn,* 98 Cal.App.2d 145, 149 [219 P.2d 511].) It thus becomes inconsequential whether the suppression of the material facts was accomplished through Wright or through Squires; in either event defendant is liable for the fraud.

■ But the matter does not stop with imputed knowledge and liability. On March 24, 1954, defendant received from plaintiff's accountants a letter (Exhibit 33) saying: "We have been authorized to audit the accounts of Aetna Factors Co (Factors for M. E. Wright Lumber Co.) as at March 23, 1954 and desire to verify your account as stated below:

| Mar 10 | #8020 | $1,205.99 |
| Mar 10 | 8021 | 1,224.51 |
| Mar 10 | 8022 | 2,638.84 |
| | | $5,069.34 |

Kindly compare this statement with your records and advise us as to the correctness of the amount indicated." Defendant, through its bookkeeper, whose authority is not questioned, replied on or about March 25 by postscript added to the letter and reading as follows: "The above balance represents the correct amount according to our records, as of the above specified date." Voucher number 8022, one of those covered by this document, is a part of the group which were never covered by shipment of lumber, and defendant now says that it was without consideration. This acknowledgment of its validity was plainly an invitation to plaintiff to continue buying receivables tendered by Wright company as owing by defendant. At this point, if not before, a positive duty rested upon defendant to speak and to disclose the fact that voucher

number 8022 was fictitious and that he recognized no obligation to pay the same. Mr. Henson, defendant's bookkeeper, testified that any bona fide invoice would be posted in the invoice record but that would not be done until he knew the lumber had been shipped. "A. Well, if it was a bona fide invoice when it came in, it was posted into the invoice record which was in the book of original entry. Q. How could you tell whether it was a bona fide invoice? A. Well, whether the lumber had been shipped or not. Q. You mean when you received an invoice on which you knew lumber had been shipped, you'd enter it into the invoice record, is that correct? A. That is correct. Q. And you would not enter it until you were certain that lumber had been shipped? A. That is correct." "Q. Do you recall receiving the 6 invoices over which this suit has been filed? A. I do recall receiving them. Q. What did you do with those invoices? A. Those invoices when I received them, I immediately, or not immediately, but within a few minutes after receiving them, I called the Wright Lumber Company. Q. What was the substance of your conversation at that time? A. I asked them what these invoices were for. Q. After your conversation with the Wright Lumber Company, what if anything, did you do with the invoices? A. All but one invoice I threw in the drawer with the rest of them. Q. What did you do with that one invoice? A. That one invoice, because lumber had been actually shipped, I set up for payment." Of the six invoices involved in the action, one was purchased on March 25, 1954, the day of defendant's verification of the earlier ones as correct, and the last three were purchased on March 26 and 29, 1954. It thus appears that defendant was guilty of a willful concealment of material facts as to plaintiff's purchase of the last three or four receivables involved in this action, and a nonsuit as to those items was manifestly improper. The judgment of nonsuit must be reversed.

In view of the necessity of a new trial certain of the many claims of error in ruling upon evidence and other questions of law will be passed upon.

■ The court held that one conspirator cannot be sued without joinder of his coconspirator. This was error, as was held in *Sayadoff* v. *Warda*, 125 Cal.App.2d 626, 629 [271 P.2d 140].

■ The court initially excluded or later struck most of the evidence of the agreement made between Wright Company and defendant concerning the handling of invoices in cases

of no delivery of lumber, this because it preceded plaintiff's contract and occurred between other parties. The rejected evidence established a course of dealing which the parties pursued in selling receivables to plaintiff. It was not hearsay within the exclusionary rules, but embraced verbal acts of the parties, independently relative evidence of what was done by the conspirators in dealing with plaintiff. (See 19 Cal.Jur. 2d § 378, p. 109; 31 C.J.S. § 239, p. 988.)

Plaintiff's efforts to show the customary meaning of the word "invoice" as used in the lumber industry were thwarted by adverse rulings of the trial judge. The following offer of proof was rejected: "What we would like to establish by the witness's testimony is that it is generally and customarily understood in the lumber industry in this area that an invoice represents merchandise actually shipped or stored for the purchaser's account, and to which title has been transferred, and that this is the general understanding of the lumber industry; that accordingly, Mr. Squires would have knowledge that anyone dealing with the invoice would assume that the invoice did represent what invoices customarily represent in the lumber industry, namely, merchandise shipped or merchandise to which title has been transferred in the seller's yard." The term "invoice" is not a technical one and does not have a single settled connotation (48 C.J.S. p. 764). The rule is well established that a custom prevailing in a given industry is binding upon those engaged therein though there be no specific proof of knowledge on the part of the particular party to the litigation. *Body-Steffner Co.* v. *Flotill Products, Inc.,* 63 Cal.App.2d 555, 558 [147 P.2d 84]: "It is a rule of practically universal acceptation in common law jurisdictions that however clear and unambiguous the words of a particular contract may appear on its face it is always open to the parties to the contract to prove that by the general and accepted usage of the trade or business in which both parties are engaged and to which the contract applies the words have acquired a meaning different from their ordinary and popular sense." At page 560: "Where two parties engaged in the canned goods trade in the same locality, as here, enter into a contract they are bound by a generally accepted usage of the trade in that locality giving to the terms and language actually used in their contract a particular meaning and legal significance, even though that meaning may be at variance with the normal meaning and interpretation which would be given to that language in the

absence of proof of the usage of the trade." (See also *Covely* v. *C.A.B. Construction Co.*, 110 Cal.App.2d 30, 33 [242 P.2d 87] ; *Correa* v. *Quality Motor Co.*, 118 Cal App.2d 246, 251 [257 P.2d 738] ; *California Lettuce Growers* v. *Union Sugar Co.*, 45 Cal.2d 474, 482 [289 P.2d 785, 49 A.L.R.2d 496].)

■ The rulings on this subject were erroneous.

Plaintiff was precluded from testifying that he relied upon the confirmation of March 25, 1954 (Exhibit 33), which was sent to his accountants and by them relayed to him, as was manifestly intended by defendant. ■ In a fraud action plaintiff is not confined to circumstantial proof or presumption of reliance; he is entitled to testify as to whether he relied upon the false representation or concealment of defendant. (See *Fagan* v. *Lentz*, 156 Cal. 681, 688-689 [105 P. 951, 20 Ann.Cas. 221] ; *Luitweiler etc. Co.* v. *Ukiah etc. Co.*, 16 Cal. App. 198, 210 [116 P. 707, 712] ; *Harned* v. *Watson*, 17 Cal. 2d 396, 403 [110 P.2d 431] ; *Southern Pac. Co.* v. *Libbey* (CA 9 Cir.), 199 F.2d 341, 348-349 ; 37 C.J.S. § 109b, p. 421).

■ This is true because a witness may always testify to the state of his own mind when it becomes a material fact in the case. (See 18 Cal.Jur.2d § 151, p. 602 ; *Starck* v. *Pacific Electric Ry. Co.*, 172 Cal. 277, 285 [156 P. 51, L.R.A. 1916E 58] ; *Kyle* v. *Craig*, 125 Cal. 107, 114 [57 P. 791].)

Fraud assumes as many and complex forms as the ingenuity of man is able to devise. Rarely can it be proved by direct evidence; usually, as here, the plaintiff must establish his cause of action by circumstantial evidence, if at all. ■ Trial judges should be sensitive to the fact that a trial is a search for the truth and because of the nature of a fraud action liberality in the receipt of evidence should be indulged to a degree commensurate with the difficulties of the proof. (*Butler-Veitch, Inc.* v. *Barnard*, 77 Cal.App. 709, 714-715 [247 P. 597] ; *Bradley* v. *Osborn*, 86 Cal.App.2d 18, 22 [194 P.2d 53] ; *Dyke* v. *Zaiser*, 80 Cal.App.2d 639, 654 [182 P.2d 344] ; 37 C.J.S. § 104, p. 410.) Volume 24, American Jurisprudence, section 281, p. 126 : "A court in looking for proof of fraud is not confined to 'wide open spaces' or to detailed proof of fixed and definite overt acts or conduct. Facts of trifling importance when considered separately, or slight circumstances trivial and inconclusive in themselves, may afford clear evidence of fraud when considered in connection with each other. It has been said that in most cases fraud can be made out only by a concatenation of circum-

stances, many of which in themselves amount to very little but in connection with others make a strong case."

The judgment is reversed.

Fox, Acting P. J., and Richards, J. pro tem.,* concurred.

A petition for a rehearing was denied January 14, 1958, and respondent's petition for a hearing by the Supreme Court was denied February 11, 1958.