## SHELTON v. THOMSON.
### No. 8590.

Circuit Court of Appeals, Seventh Circuit.
March 2, 1945.

Rehearing Denied April 10. 1945.

Drennan J. Slater and James B. O'Shaughnessy, all of Chicago, Ill., for appellant.

Royal W. Irwin, of Chicago, Ill., for appellee.

Before EVANS and MAJOR, Circuit Judges, and BRIGGLE, District Judge.

EVANS, Circuit Judge.

Plaintiff brought this action under the Federal Employers' Liability Act, 45 U.S. C.A. § 51 et seq., and recovered a verdict and a judgment, for injuries sustained by him because of alleged carbon monoxide poisoning. He operated a crane in a storehouse of the Chicago and North Western Railway Co., the crane being used to lift wheels and other supplies, which were in turn used in the repair of defendant's freight cars. Plaintiff claims that his continual inhalation of carbon monoxide gas from the crane's gasoline motor from March or April of 1942 until the fall of 1942, resulted in permanent disabling injury. It is his contention, accepted by the jury, that the monoxide gas would have

been excluded from the cab in which plaintiff was seated in the crane, if there had been a sound, tight fitting asbestos gasket. The gasket was defective, however, and though plaintiff requested another, none was forthcoming, and as a result, the gas escaped and he was poisoned. He attempted to stop the leaking by caulking, but failed.

There are two questions here: (1) The applicability of the Federal Employers' Act to plaintiff's employment is challenged. (2) The trial court's refusal to instruct the jury on the necessity of "reasonable certainty," where damages for permanent injuries are included in the verdict.

Plaintiff was forty years of age, and had been employed by the C. & N. W. Railroad for thirteen or fourteen years. He started work on the crane involved in this controversy, when it was new, in 1937. He left this job but came back again to work on it in March or April of 1942.

The crane was provided with a winter and summer fan, which, by virtue of the construction of its blades, could be made to blow the heat from the motor away from the crane cab in the summer and in the winter blow it into the cab. Plaintiff's health had been good, but after working on the crane for awhile it "started to go downhill" and he "got to feeling sick and nauseated." The last of April he stayed home in bed for five days, and was attended by a doctor who is now in service. Then he returned to work. He operated the crane all summer and had a feeling of nausea all the time, but didn't know there was anything wrong with the engine at that time. On September 25th, on leaving the crane, he had a severe attack of dizziness and illness, and told his foreman that there must be carbon monoxide or some gas leaking into the cab of the crane. A check of the motor was made and a gas leakage was found, indicated by a deposit of carbon. He worked until the 30th of September, when he became so sick he was taken to a hospital where he promptly recovered. He returned to the railroad a couple of days later and, after a check-up at the dispensary, he was pronounced in "A-1 condition" and sent back to work. His foreman "told him to take it easy," and he worked around the storehouse for a couple of hours. Then he went home and to bed. He said he "couldn't move." He went back to work on January 4, 1943, working in the storehouse. Later he returned to work on the crane, doing light work, for a period of seven days. Then he was sick in bed again for eight days. When examined by a doctor he was told "to take aspirin and cough syrup." He said his family was starving so he had to go back to work, where he stayed until June 5, 1943, when "the weather got so hot, he had to stay home."

Both sides presented expert testimony as to the symptoms and effect of carbon monoxide poisoning. There is this agreement in the testimony. Much depends upon the amount of carbon monoxide inhaled. Above a certain percentage there is death, or permanent injury, insanity, etc., and below a certain percent there is but temporary indisposition, and recovery is prompt. Plaintiff's testimony of his subjective symptoms jibed with the symptoms described by his expert witnesses.

One doctor, testifying for the defendant, stated that he believed plaintiff was suffering merely from an inferiority complex. He examined him for carbon-monoxide poisoning and found no symptoms of it whatsoever. He stated that if a certain laboratory report of 40% carbon-monoxide content in plaintiff's blood were correct the plaintiff would be unconscious or dead. He also stated that with a 10 to 20% content, the face and mucous membrane would be cherry red from the carbon monoxide content of the blood.

This factual statement is made only because appellant assigns error in the court's instruction on the quantum of proof necessary to establish permanent injuries.

Appellant contends that plaintiff does not come within the protection of the Federal Employers' Liability Act. This Act was amended in 1939 to read:

"Any employee of a carrier, any part of whose duties as such employee shall be the *furtherance of interstate or foreign commerce;* or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter." (Italics ours.) 45 U.S.C.A. § 51.

Prior to its amendment the Act provided for the employer's liability to an employee for injury suffered only when the

employee was engaged in "such commerce" which phrase referred to "commerce between any of the several States."

Appellant argues that plaintiff, employed in the railroad's storehouse, operating a crane which hoisted car wheels into position for repair on freight trains, some of which were used in intra- and others in inter-state commerce, was not one who could conceivably be said to be engaged in interstate commerce.

However, we have before us, for construction, the amended act, not the original section. There can be no doubt but that the amendment was intended to broaden the scope of the Act to include employees whose work was related to the functioning of interstate commerce. Concededly the relationship between the encompassed occupations and the actual transportation in interstate commerce has become more tenuous as this law has developed. It was this fact, no doubt, that caused Congress to enlarge the scope of the Act by stating that all employments in *furtherance* of interstate * * * commerce" are within the Act. The word "furtherance" is a comprehensive term. Its periphery may be vague, but admittedly it is both large and elastic. It would not be an undue stretching of it to hold that one who is engaged with others in the process of repairing the car so that it may thereafter be moved in interstate (or by happenstance in intrastate) commerce, is engaged in an occupation "in furtherance" of interstate commerce.

A car can not travel even in interstate commerce, without wheels. Ordinarily a car is as usable in interstate as in intrastate commerce. The same crane which plaintiff operated, moved many articles. Some were used on cars which moved in interstate commerce. No one in the employ knew where the car wheel would be used. Perhaps the success of the repair efforts would determine its future use.

The report of the Senatorial Committee indicates that the amendment was intended to extend the application of the Federal Employers' Liability Act to employees, like plaintiff, who are engaged in work which left them and their attorneys in deepest doubt as to the law which governed their employers' liability and their right to recover damages for injuries which they might receive. The amendment was, we believe, a much needed one—and the selection of the phrase "*furtherance* of interstate * *

commerce" to accomplish the purpose of clarification, an effective and purposeful one.

Instruction. Defendant requested this instruction:

"Unless you find from the evidence that plaintiff has proved, as to each of his claimed injuries, by a preponderance of the evidence *and to a reasonable certainty,* that such injury is permanent, you must not assess damages for any such injury as or for a permanent injury." (Italics ours.)

The trial court gave the instruction, but only after deleting the italicized words, "and to a reasonable certainty." Error is predicated thereon.

Plaintiff argues that the trial court ruled correctly—that in Illinois it is sufficient if the plaintiff prove his case by a preponderance of the evidence. This applies to all issues, including damages. He asserts that a court may add no other qualifying phrase to the instruction such as the one which the court here eliminated.

Defendant, on the other hand, contends that in the instant case, the substantial verdict rendered was due to the plaintiff's claim (and proof) that he was suffering from injuries which were permanent in nature; that the heart of the controversy was over the existence of asserted permanency of injuries. The proof necessary to establish permanency of injuries was, therefore, a vital, if not determinative issue.

Our study of the evidence persuades us that the verdict can not be sustained unless the plaintiff suffered permanent injuries. As to the existence of permanent injuries, the opinions of the medical experts can not be reconciled. They are hopelessly in conflict. This being so, the court was under the duty to fully, carefully and correctly instruct the jury on the law which defined the proof necessary to establish permanent injury. In other words, if error were committed by it, in view of the importance of this issue, it was reversible error.

Courts have had many occasions to pass upon the phase of permanency of injuries in personal injury cases. So frequently have they spoken and so uniform is their language that we are not warranted in elaborate citation of decision or discussion of the rule laid down. We quote from an Illinois decision as this injury occurred in Illinois, Lauth v. Chicago Union Traction Co., 244 Ill. 244, 251, 91 N.E. 431, 434.

There the court said, speaking of alleged permanent injuries: "To form a proper basis for recovery, however, it is necessary that the consequences relied on must be reasonably certain to result." The court then quoted from Strohm v. New York, Lake Erie & Western Railroad Co., 96 N. Y. 305, as follows:

" 'Future consequences, which are reasonably to be expected to follow an injury, may be given in evidence for the purpose of enhancing the damages to be awarded; but to entitle such apprehended consequences to be considered by the jury they must be such as in the ordinary course of nature are reasonably certain to ensue. Consequences which are contingent, speculative, or merely possible are not proper to be considered in ascertaining the damages. It is not enough that the injuries received may develop into more serious conditions than those which are visible at the time of the injury, nor even that they are likely to so develop. To entitle a plaintiff to recover present damages for apprehended future consequences there must be such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury.' "

Our concern is not over the rule of law. That is too clear for debate. It is confined to the sufficiency of the instruction,—to a somewhat unfortunately drawn, or unfortunately punctuated proposed instruction. Then too, we must consider plaintiff's contention that the instruction, as finally given, merely dealt with the rule of preponderance of evidence in civil cases and did not deal with the character or nature of the injury which is another matter disassociated from the subject of quantum of proof.

We are unable to accept the plaintiff's view. We think it is quite clear that the court understood, as counsel intended it should understand, that the proposed instruction was requested in order that the jury might be enlightened upon the most important issue in the case, to-wit, the extent of the plaintiff's injuries.

Defendant was seeking an instruction on the certainty of the permanency of the injury so that the jury would render an enlightened and understanding verdict. The requested instruction was intended as a statement that there must be a preponderance of proof leading reasonably to the conclusion that the injury is certain to be permanent, before recovery therefor could be had. Failure to instruct on this issue was error. While the tendered instruction was clumsily and inartistically drawn, yet we think it focused the court's attention to the issue of permanency of injury and demanded an instruction thereon from the court. The jury was entitled to guidance. It was a case where an enlightened verdict was possible only when the jury was clearly instructed on the highly disputed, yet determinative issue in the case.

The judgment is reversed with directions to grant a new trial.