George A. **STRAUB**

v.

**READING COMPANY, Appellant.**
No. 11382.

United States Court of Appeals,
Third Circuit.

Argued Dec. 10, 1954.

Decided March 10, 1955.

John R. McConnell, Philadelphia, Pa.
(Morgan, Lewis & Bockius, Philadelphia,
Pa., on the brief), for appellant.

B. Nathaniel Richter, Philadelphia,
Pa. (Richter, Lord & Farage, Philadel-
phia, Pa., on the brief), for appellee.

Before McLAUGHLIN, KALODNER
and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellant's main ground for reversal
of this district court judgment in favor
of appellee is that it was deprived of a
fair trial by reason of the deliberate
conduct of appellee's attorney throughout
the trial.

The suit was under the Federal Em-
ployers' Liability Act, 45 U.S.C.A. § 51 et
seq. Appellee was assistant chief time-
keeper for appellant. While on a ladder
in the storeroom in appellant's Philadel-
phia terminal he fell and sustained in-
juries. On the merits, the disputed con-
dition of the ladder was important. On
damages, the allegation that appellee's
back had been seriously injured from the
fall was strongly controverted.

The conduct complained of began early
in the trial. Plaintiff, who claimed an
injury to his back resulting from his fall,
was being cross-examined regarding the
condition of his back prior to the fall.
He admitted that he had had sacroiliac
trouble "for the past ten years" and that
he had been taking treatments for back

trouble "for one kind or another, for ten years before the accident." He said he went once to a doctor during that period. Then he said, "Twenty some years ago, fourteen or fifteen years ago, I went to Doctor Beidelman." He was asked, "In Reading?" He answered, "Yes, sir." He was asked, "How many times did you go, do you know?" Then came one of the objected to interruptions by plaintiff's counsel, Mr. Richter, who instead of waiting for his turn on redirect said:

"Just a minute. Let us get these things straight. If you are talking about things other than the back that is another story. I object to your suggestion that a cold or bronchitis would have anything to do with this. I have the record from which I would like to read; it is the official company record, the medical record in this case, and I think I picked out in my direct examination each and every time when there was anything that could possibly be associated with his back,—if Your Honor will look at this."

The defense attorney moved for a withdrawal of a juror on the ground that the comments had been made in front of the jury. Mr. Richter, still in the presence of the jury, said, "Haven't I stated the truth?" Mr. McConnell, defendant's counsel, said, "I think no." Mr. Richter continued "Of course not, but if Your Honor will refer to Mr. McConnell's record—your own record—". Mr. McConnell attempted to address the trial judge who broke in and said "I will overrule that motion and give you an exception, Mr. McConnell."

The cross-examination continued with the defense attorney directing the plaintiff's attention to the fact that its subject was plaintiff's back trouble. Plaintiff was asked, "How many times did you see Dr. Beidelman for back trouble? A. Once. Q. Just one time? A. That was caused by bronchial condition. Q. Over a period of ten years—". And Mr. Richter again broke in the cross-examination and the unfinished question by comment-ing "That was on account of a bronchial condition the witness said."

A little later one of plaintiff's medical experts, Dr. John, was being cross-examined regarding plaintiff's back condition. The doctor was being reminded that the plaintiff had testified that he had pain with his back for ten years prior to the accident. Then occurred the following:

"Q. Mr. Straub has testified that he had pain with his back for 10 years before this accident, doctor.

"Mr. Richter:—That is not accurate at all, Your Honor, and I absolutely object to Mr. McConnell insinuating that sort of thing into this record because that is not so.

"The Court:—He said that his back was his weak spot and that he had trouble with that, but nothing in the way of an accident had been testified to.

"Mr. Richter:—And moreover he said he had two periods in which for short periods of time he had some pain in his back and I have these records right in front of me, now, Mr. McConnell, you are not going to put things into this record that aren't in it, and I am going to stop you.

"Let us go right to the record and see. In 1942, Your Honor—I have all these records right here—in 1942 we have an acute cervical sprain which lasted 4½ days. Now, there is nothing more on the back until in 1944, several cervical fractured ribs when he was helping a friend down the steps, and that was a question of six days. Now, we have nothing until we get to 1947 when we have the man with an acute bronchial pneumonia which threw his back out—that is 1947, Your Honor.

"Now, there is nothing whatsoever between 1947 and 1949, the date of this accident, which is over two years.

"The Court:—Mr. McConnell, at side bar we had a little discussion about a question. You said you would put the question. Do you want to put that question?

"Mr. McConnell:—If Your Honor please, I want to point out, in view of Mr. Richter's remarks I want to remind the Court and also Mr. Richter that on the cross examination of Mr. Straub I said to him: 'George, haven't you had sacroiliac trouble for the past ten years and received treatment during that time,' and after a while he said yes. Now, that is what I had in mind.

"The Court:—That is the sacroiliac, nothing from any accident. Dr. John is asking about if there was another accident. He said he had not heard about it.

"Mr. McConnell:—There isn't any other accident that we know of.

"Mr. Richter:—And all that Mr. Straub meant is that 10 years ago was the first time that he had anything with his back. But here are the actual records, and there is no use in trying to insinuate into this case that here is a man who had trouble within a 10 year period, and that is not so.

"Mr. McConnell:—I move for the withdrawal of a juror.

"The Court:—I think we got that all pretty clearly.

"Mr. McConnell:—I move for the withdrawal of a juror, if Your Honor please, that Mr. Richter is making statements of fact to the jury that are not in the record.

"Mr. Richter:—Are you through with this man?

"Mr. McConnell:—No. I assume that motion is overruled Your Honor?

"The Court:—Do you want to put a question?"

In the cross-examination of Dr. Yaskin, another medical expert in plaintiff's case who gave his opinion of the cause of plaintiff's back condition, the defense was attempting to find out if the doctor had been given a history of plaintiff's previous trouble with his back. He was asked, "Did Mr. Straub tell you whether he had any trouble with his back before this accident?" The doctor answered "Yes, I heard a report he had one in 1947—." Once more the plaintiff's attorney interrupted with a gratuitous statement "In 1942 there was something about bronchial pneumonia and some subluxation of the sacroiliac which was corrected."

Where the above type of trial tactics is continued for the duration of a trial as here it is difficult to keep the opinion from being to some extent a catalogue of illustrative incidents. Therefore pausing for brief comment on the above related series, we note that the defense attorney was unfairly hampered in his cross-examination by Mr. Richter. The latter improperly averted the attention of the jury from the prior back condition to the bronchitis; he deliberately and improperly made statements concerning what he called "the medical record in this case" which was not yet in evidence. In all of this despite the objections of counsel, the trial court neither admonished him nor endeavored to advise and guide the jury as to the significance of these occurrences. The net of it was that the conduct not only remained unchecked but as far as the jury could be expected to understand was in effect approved by the court. In that situation in addition to the cross-examination being materially weakened the believableness of the defense contention of the reason for the back trouble may well have been completely undermined; certainly the latter was the obvious intent of plaintiff's attorney.

The proof of plaintiff's claim both as to the accident and injury was put in to an unconscionably large extent by leading questions. Little seems to have been left to a spontaneous explanatory answer. At times the witnesses seemed relatively unnecessary except as sounding

boards. The defense finally stated to the court:

"Mr. McConnell:—If Your Honor please, Mr. Richter has asked quite a number of leading questions up to this point and I have not objected because to do so does our cause a greater harm in the eyes of the jury; and, as a matter of fact, I won't be able to object effectively without greater loss than gain even in the future. So I want to ask Your Honor if you won't caution him not to ask leading questions.

"The Court:—I will be glad to.

"Mr. McConnell:—Thank you very much.

"The Court:—I don't think the leading questions have been very productive in the way of leadership.

"Mr. McConnell:—But they could become so.

"The Court:—They could become so. Will you watch it, please?"

Immediately thereafter the same sort of questions continued; for example to the plaintiff regarding an acute cervical sprain in his neck. "Q. Now, then, did that clear right up after that? A. Yes, sir." Objection was made to this on the ground "That is exactly what we have just discussed." The court commented "I don't think that offends" but suggested that in the future Mr. Richter phrase such questions "did it or did it not." The leading questions continued in this manner with the plaintiff replying correctly to the statements of his lawyer. Sometime thereafter in the further course of the direct examination of plaintiff as to his duties the following happened:

"Q. Does that involve the movements of men that are actually moving trains or assisting in the movements of trains, or in the furtherance of interstate commerce throughout the Reading system?

"A. Yes, sir.

"Mr. McConnell:—I object to the question.

"The Court:—What was that, Mr. McConnell?

"Mr. McConnell:—I object to that question as suggesting the answer that it requires.

"The Witness:—I check all employees.

"The Court:—Is that satisfactory to you, Mr. McConnell?

"Mr. McConnell:—Well, if the question is stricken it will be. He just practically told him what to say in it.

"Mr. Richter:—That is not so.

"The Court:—He asked what work he does and he is telling it now. If you want to go with more particularity into it—"

And on the next page of the transcript:

"Q. So that these men work in all these four states that you have just mentioned; is that correct? A. Yes.

"Q. Right on the Reading system? A. That is right.

"Q. And do you personally have to go to these different states and go in interstate commerce yourself personally? A. Yes, sir."

The testimony of Dr. John was given at least partially by affirming question statements to him by Mr. Richter. This also applied to Mr. Arinsberg, the plaintiff's witness who brought the Veterans Administration records. For example:

"Q. In other words, Mr. Arinsberg, the only thing that he came out of the war with and the government was concerned with was the question of whether there was any condition of disability due to the influenza that he had during the war. A. That is correct, anything service-connected.

"Q. And there was no service connection in any way with the back condition of any kind? A. That is correct."

The direct examination of witnesses on behalf of plaintiff was in part a sys-

tematic detailed presentation of the Straub claim on both its aspects, negligence and damages, by his attorney through leading questions. That course of conduct was grossly improper. It was objected to in timely fashion by the other side. Beyond question the court's attention had been sharply focused on the method being employed with the realistic reminder that the defense could not be constantly objecting, especially when nothing was done about it, because of the probable prejudice to its cause in the minds of the jury.

Finally we come to the summations for the plaintiff.

In his first talk he started out by telling the jury regarding the ladder that "Everybody admits it was * * * a botched-up repair job." This was a misstatement of fact. Even plaintiff's witness Feege, while he said the ladder was shaky, had used it since 1933 and never fell on it in any way; it had never been broken to his knowledge and he did not know of it being in any disrepair.

On his rebuttal summation Mr. Richter started out by saying that the plaintiff "is entitled to come into the court room and be treated fairly and sympathetically by everybody, including the lawyer who is conducting their defense. He is not going to build a reputation by knocking down George Straub." Claiming that the defense attorney had insinuated Straub had taken the ladder and hid it,[1] Mr. Richter said:

"* * * but when he brings in insinuations then it is time I call a spade a spade because he isn't going to grow fat on crippled Mr. Straub as far as I am concerned, and he is going to try this case on its merits. He is very adroit, but he has got to get up early to pull some of the fast ones he thinks he can get away with. He read from the testimony of George Straub, and he tries to ex-

plain the facts, saying that George Straub was all crippled up before this accident happened. He reads part of the record to you, but you don't do that if you are trying the case on the square."

In talking about his cross-examination of the only eye witness, Mrs. Fulton, whose testimony the defense regarded as the most important in the case next to the plaintiff's, Mr. Richter said:

"* * * do you think I would ask this woman these questions unless I knew what the answer should be? I had her statement. If she didn't back up her statement then I would read the statement, as I did to the others when they tried to 'walk out'. She was perfectly honest and told us a story truthfully and no one can have any criticism of it."

The statement referred to was not in evidence. It was mentioned for the first time in this final moment of the trial with no opportunity for the defense to cross-examine regarding it. It is impossible to say that this late comment as to the eye witness might not have been a resolving element for the jury on its negligence problem.

Plaintiff's attorney concluded his rebuttal by saying:

"Then, Uncle Sam says he has got something wrong in 1953 when they made this claim, but it is not our disability, don't put that on the taxpayer; the Reading Company can't unload this man on you and I,—we are the taxpayers; let the company that is responsible under the law, not Uncle Sam, pay for this. The Reading Company is going to pay, and they are responsible.

"I have only tried to bring out the facts as fairly as I can; I wasn't standing on technicalities, or insinuations, and not dig into the man's youth and try, to find something

---

1. The only alleged basis for this was the following cross-examination of Straub:

"Q. Where is that ladder now? You didn't have it removed? A. No.

"Q. Nobody removed it for you? A. No, sir, absolutely not.

"Mr. McConnell:—All right."

against him. Come back with the real verdict and don't try to besmirch this man."

Following that counsel for the defense said:

"Mr. McConnell:—If Your Honor please, I would like to make a motion again at this time for withdrawal of a juror in this instance because Mr. Richter has informed the jury of facts which are not in the record, and on important matters at that, and his concluding address was calculated to appeal to bias and prejudice."

The court commenting on the defense motion said to defense counsel "I think you are making a mountain out of a mole hill."

We think that the entire pattern of this trial shows a conscious successful effort on the part of plaintiff's attorney which resulted in a confused distorted picture going to the jury to the grave prejudice of the defense. The latter had substantial grounds for contesting the contention on behalf of plaintiff that his present back injury resulted from his fall from the ladder. They were entitled to pursue that theory within legitimate bounds. They were prevented from so doing for all practical purposes by the unwarranted conduct of the plaintiff's attorney. Contrary to the assertion of appellee prejudice and harm did result to the appellant. Appellee argues that this "is much ado about nothing" as the "verdict was only in the sum of $10,000 * * *." He goes on to say that "Obviously, the jury concluded that the plaintiff had some prior condition which had to some degree been aggravated or activated by the trauma sustained in this accident." However, if the prior condition had been fairly developed the jury might have concluded that the accident had no connection at all with the back condition as the defense urged.

Appellee's attorney, despite protestations to the contrary, argues that his course on summation was dictated by statements of the defense. Factually we find nothing substantial to support him. Legally it is unsound. Robinson v. Pennsylvania Railroad Co., 3 Cir., 1954, 214 F.2d 798, 801.

■ Regarding the leading questions, appellee asserts that this problem is within the control of the trial court. This may be true in an ordinary law suit. But where that control is lost or at least palpably ignored and the conduct is a set piece running the length of the trial which produces a warped version of the issues as received by the jury, then that body never did have the opportunity to pass upon the whole case and a judgment based on that kind of a twisted trial must be set aside. We reiterate that an isolated remark "in the ardor of advocacy, and in the excitement of trial" is no ground for reversal. Marron v. Atlantic Refining Co., 3 Cir., 1949, 176 F.2d 313, 316, certiorari denied, 1950, 339 U.S. 923, 70 S.Ct. 611, 94 L.Ed. 1345. Nor will we "order a new trial every time one lawyer makes remarks about an opposing party in a law suit which that party's lawyer does not like" or on matters which were "proper subjects of comment by counsel." Casso v. Pennsylvania Railroad Co., 3 Cir., 1955, 219 F.2d 303, 306. But where, as here, there has been calculated sustained improper conduct producing biased issues as they went to the jury we cannot decline to act. See Robinson v. Pennsylvania Railroad Co., supra. Appellant thereby was deprived of its right to a fair trial. Civil or criminal, a trial is not a contest in which no holds are barred. It is the determination of basic rights under our Constitution. Knowledge, skill and experience in the presentation of the contentions of the parties are helpful to the court and jury but misused to deprive a litigant of its day in court the result can be as it is in this appeal. Winning, so called, at all cost puts the cost too high.

Appellant also contends that the action should be dismissed entirely because the appellee, an assistant chief timekeeper, is not covered by the Federal Employers' Liability Act. That Act covers "Any employee of a carrier, any part of whose

duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce * * *."

The Federal Employers' Liability Act does not cover all employees of railroads. Holl v. Southern Pacific Company, D.C.N.D.Cal.1947, 71 F.Supp. 21. In the Holl case the plaintiff was a clerk in a freight claim department. When a claim for lost or damaged freight came in, her duty was to write on a form the route over which the freight had traveled. The district court in California correctly held that her duties did not further or substantially affect interstate commerce.

We have been referred to no case other than the Holl case which strictly involved a so-called "paper worker" like the appellee here. Nevertheless, we are aware that a traveling freight agent who solicited potential shippers, a messenger who carried waybills from one freight office to another, and a lumber inspector who selected lumber for railroad ties from lumber companies have all been held to be within the Act's coverage. Kettner v. Industrial Commission, 1951, 258 Wis. 615, 46 N.W.2d 833; Bowers v. Wabash Railroad Co., Mo.App.1952, 246 S.W.2d 535; Ericksen v. Southern Pacific Co., 1952, 39 Cal.2d 374, 246 P.2d 642, certiorari denied, 1952, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 693.

In the instant case appellee did his work in four different states but that fact has no bearing on whether his duties furthered or substantially affected interstate commerce. Appellee's duties as assistant chief timekeeper involved the "inspection of the reporting of time at point of origin or outside locations" in order to prevent payroll padding and to ensure appellant's compliance with the Federal Hours of Service Law.[2] In other words, appellee helped supervise the appellant's timekeeping system so that the men who operated the trains (1) were properly paid and (2) were not allowed to work more than sixteen consecutive hours.

Appellee was no mere clerk as in the Holl case. In the absence of the chief timekeeper he apparently made the final decisions respecting wage shortages, overpayments, and the like. Though this is definitely a borderline case, we think that unless the Supreme Court should indicate to the contrary enough has been shown to bring this employee within the current broadly interpreted coverage of the Federal Employers' Liability Act. See Robinson v. Pennsylvania Railroad Co., supra.

The judgment of the district court will be reversed and the cause remanded for a new trial.