30 F.3d 136
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
John STRYKOWSKI, Plaintiff-Appellant,
v.
NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION,
d/b/a Metra/Metropolitan Rail, ("Metra"),
Defendant-Appellee.
 No. 93-2724.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 21, 1994.
Decided June 28, 1994.
 
 Before MANION, KANNE, and ILANA D. ROVNER, Circuit Judges.
 ORDER
 MANION, Circuit Judge.
 
 
 1
 John Strykowski ("Strykowski") appeals the dismissal of his lawsuit against the Northeast Illinois Commuter Railroad Corporation, d/b/a Metra/Metropolitan Rail ("Metra") on jurisdictional grounds. We reverse and remand.
 
 Background
 
 2
 Strykowski brought this action against Metra pursuant to the Federal Employer's Liability Act ("FELA"), 45 U.S.C. Sec. 51, for injuries that he sustained on April 13, 1990 and April 23, 1991, while in the course of his employment with Metra. Metra denied the existence of subject matter jurisdiction and the district court directed Metra to file a brief setting forth the basis for this challenge. The court also requested that plaintiff submit an informal letter of citations on this question. After considering these documents but without more, the district court summarily dismissed the complaint, holding that the court lacked subject matter jurisdiction because Strykowski's activities as an employee of Metra failed to meet the second prong of a two-part test under section 51 of FELA: whether Strykowski's duties as an employee of Metra in any way furthered Metra's purported activities in interstate commerce.[1]
 
 
 3
 The parties argue this point again on appeal, requesting in the alternative that this court remand to the district court to allow further development of the record on the question of subject matter jurisdiction under section 51 of FELA. We agree that the case should be remanded, but note that there is an even more fundamental jurisdictional question that must be resolved prior to any further development of the record under FELA--that is, whether plaintiff's suit is barred in federal court under the Eleventh Amendment. While neither the parties nor the district court raised or discussed this potential problem, it is fundamental to our jurisdiction. We, therefore, raise it sua sponte. Crosetto v. State Bar of Wisconsin, 12 F.3d 1396, 1402 n. 10 (7th Cir.1993), cert. denied, 62 U.S.L.W. 3785 (1994); accord Smith v. Wisconsin Dept. of Agriculture, Trade and Consumer Protection, No. 93-2423, slip op. at 12 (7th Cir. May 2 1994) (Crosetto "squarely held that federal courts--per the 'Hans doctrine'--lack subject-matter jurisdiction over suits against a state"). Because the record in this action is inadequate to make such a determination on appeal (this case having been dismissed in its infancy), we remand to the district court to determine the applicability of the Eleventh Amendment to this case and, if it is determined that the Eleventh Amendment does not bar plaintiff's suit in federal court, then to allow the parties an opportunity to further develop the record on the question of subject matter jurisdiction under FELA.
 
 Discussion
 
 4
 In order to facilitate the examination of these questions on remand, we will briefly discuss the applicable law relating to the question of our jurisdiction under the Eleventh Amendment with some direction on the question of subject matter jurisdiction under Sec. 51 of FELA.
 
 I.
 
 5
 The Eleventh Amendment, while expressly referring only to suits against a state by citizens of another state, has been held to bar a citizen from bringing suit against the citizen's own state in federal court. Welch v. Texas Dept. of Highways and Public Transp., 483 U.S. 468, 472 (1987); Hans v. Louisiana, 134 U.S. 1, 10, 21 (1890). While this holding has been questioned in modern times, it has nevertheless survived the latest pronouncements by the Supreme Court. See e.g., Pennsylvania v. Union Gas Co., 491 U.S. 1, 7, 30-36 (1989); Welch, 483 U.S. at 478-495 (and cases cited therein). The rule is not without exceptions, however. First, because the Eleventh Amendment is necessarily limited by the enforcement provisions of Sec. 5 of the Fourteenth Amendment, Congress can abrogate the Eleventh Amendment without the State's consent when it acts pursuant to its power to enforce, by appropriate legislation, the substantive provisions of the Fourteenth Amendment.[2] Welch, 483 U.S. at 474. Second, the state may waive its immunity and consent to suit in federal court. Id. at 473. In addition, while not an exception to Eleventh Amendment immunity, there is a threshold question that also must be addressed: whether Metra is considered to be a "state" or "arm of the state" for purposes of Eleventh Amendment protection. We address each of these inquiries separately.
 
 A.
 
 6
 Addressing the threshold question first, whether Metra is vested with sufficient state characteristics to qualify for sovereign immunity under the Eleventh Amendment is a factual determination. For Metra to be considered a "state" or an "arm of the state" for purposes of Eleventh Amendment immunity in federal court, the district court must undergo a fact-specific factor-driven analysis. This is a close question and will no doubt require additional briefing, discovery, and a hearing to develop facts sufficient to decide the issue. The factors used to analyze this question are, however, fairly uniform, although they have been applied with varying results depending on the jurisdiction and the entity in question.
 
 
 7
 The Supreme Court identified several such factors in Lake County Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 400-02 (1979), holding that the Tahoe Regional Planning Agency was not an arm of the state (in that case two states, California and Nevada) for Eleventh Amendment purposes, but was more akin to a county or municipality. These factors include: (1) how the entity is characterized in the language of the creating statutes, (2) the source of the entity's funding--state or local, (3) whether the state is financially responsible for liabilities and obligations incurred by the entity, (4) whether the function performed by the entity is traditionally a state or local function, and (5) whether the actions of the entity are subject to state government veto. Several circuits have applied these factors with varying results. See, e.g., Feeney v. Port Authority Trans-Hudson Corp., 873 F.2d 628, 630-31 (2d Cir.1989), aff'd on other grounds, 495 U.S. 299 (1990) (applying factors considered by the Court in Lake County Estates and holding that the Port Authority was not entitled to Eleventh Amendment immunity); Port Authority Police Ben. Ass'n v. Port Authority of N.Y., 819 F.2d 413, 414-18 (3d Cir., cert. denied, 484 U.S. 953 (1987) (Port Authority was entitled to Eleventh Amendment immunity); Morris v. Washington Metro. Area Transit Authority, 781 F.2d 218, 224-28 (D.C.Cir.1986) (Transit Authority was entitled to Eleventh Amendment immunity).
 
 
 8
 The Supreme Court also entertained this question in another similar case, Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977), holding that a local school board is more like a county or municipality than an arm of the state for purposes of the Eleventh Amendment. The Court considered similar factors, including: (1) the nature of the entity--how the state characterized the entity, (2) whether the entity received guidance and money (a "significant amount") from the state, and (3) whether the entity had the power to issue bonds or levy taxes (suggesting that the entity could pay a judgment out of its own funds). See Morris, 781 F.2d at 223-24 (identifying these factors and applying them, holding that the Transit Authority was entitled to Eleventh Amendment immunity).
 
 
 9
 Finally, this and other circuits have applied similar multi-factor tests in determining whether various entities are entitled to immunity under the Eleventh Amendment. In Kashani v. Purdue University, 813 F.2d 843, 845-46 (7th Cir.), cert. denied, 484 U.S. 846 (1987), this circuit held that Purdue University was entitled to Eleventh Amendment immunity. By far the most important factor considered by the court in Kashani was the potential impact of a judgment on the state treasury. The court analyzed this factor by breaking it into what amount to five sub-factors, including: (a) the extent of state funding, (b) the state's oversight and control over the entity's fiscal affairs, (c) the entity's ability to independently raise funds, (d) whether the state taxes the entity, and (e) whether a judgment against the entity would result in the state increasing its appropriations to the entity. Other factors considered by the court were: (1) the entity's nature and general legal status--whether the entity is treated more like a state agency or a political subdivision (emphasis on substance rather than form), (2) whether the entity's governing council or board of trustees are selected by the state Governor, (3) what powers are granted to the entity (for example, the right to regulate entity property, set fees, enter into contracts, sue and be sued, engage in construction projects, etc.), (4) what power and control the state retains over the entity (for example, the power to amend, ratify, repeal, and veto decisions of the entity's governing council), and (5) the primary purpose of the entity--to serve the whole state or only a region of the state. Id. at 846-48. For other cases from this circuit touching on this question, see Gary A. v. New Trier High Sch. Dist. No. 203, 796 F.2d 940, 945-46 (7th Cir.1986); Cannon v. University of Health Sciences/Chicago Med. Sch., 710 F.2d 351, 356-57 (7th Cir.1983). For cases from other circuits analyzing this question, see Durning v. Citibank, N.A., 950 F.2d 1419, 1423-28 (9th Cir.1991); Delahoussaye v. City of New Iberia, 937 F.2d 144, 147-48 (5th Cir.1991); Fitchik v. New Jersey Transit Rail Operations, Inc., 873 F.2d 655, 659-64 (3d Cir.), cert. denied, 493 U.S. 850 (1989); Port Authority Police Ben. Ass'n, 819 F.2d at 417-18; Morris, 781 F.2d at 222-28.[3]
 
 
 10
 If after undergoing its analysis, the district court finds that a suit against Metra is a suit against the State of Illinois, it must dismiss plaintiff's claims against Metra for lack of subject matter jurisdiction unless plaintiff can demonstrate that one of the exceptions to Eleventh Amendment immunity applies in this case. Cf. Crosetto, 12 F.3d at 1402-03.
 
 B.
 
 11
 Turning to the first exception, we next examine whether Congress, in FELA, has clearly expressed an intent to abrogate Eleventh Amendment protection to the states in federal court. After a review of the cases, we determine that Congress did not clearly express such intent.
 
 
 12
 "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." Atascadero State Hospital v. Scanlon, 473 U.S. 234, 243 (1985). A " 'general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment.' " Welch, 483 U.S. at 476 (quoting Atascadero, 473 U.S. at 246). When faced with the task of applying this standard to the Jones Act (which incorporates the remedial provisions of FELA), the Supreme Court in Welch held that "Congress has not expressed in unmistakable statutory language its intention to allow States to be sued in federal court...." Id. at 475. In Welch, the Court also overruled a portion of its previous decision in Parden v. Terminal Railway of Alabama Docks Dept., 377 U.S. 184 (1964) (reasoning that Congress had expressed an intent to abrogate Eleventh Amendment immunity in FELA by making FELA applicable to "every common carrier by railroad while engaging in commerce between any of the several States...."), since it was inconsistent with the requirement that an abrogation of Eleventh Amendment immunity by Congress be expressed in unmistakably clear language. Id. at 476, 478.
 
 
 13
 If Welch left any doubt as to whether Congress, in FELA, failed to abrogate the state's right to immunity under the Eleventh Amendment, several subsequent cases have confirmed this interpretation. See, e.g., Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 305 (1990) (plaintiffs who sued the Port Authority under FELA and other Acts, could not assert that Congress had abrogated the state's sovereign immunity through any of the statutes underlying their claims, as such arguments would have been futile, citing Welch ); Hilton v. South Carolina Public Railways Com'n, 112 S.Ct. 560, 568 (1991) (O'Connor, J. dissenting) (noting that Welch held that Congress did not manifest its consent to allow states to be sued under FELA for damages in federal court); Feeney, 873 F.2d at 629 n. 2 (discussing Welch and stating that, because the pertinent language of the FELA is no more specific than the language of the Jones Act regarding the Eleventh Amendment, a claim that FELA abrogates Eleventh Amendment immunity is no longer sustainable); Fitchik, 873 F.2d at 672 (Rosenn, J. dissenting) (in light of Welch, plaintiffs' argument that FELA manifests Congress' intention to abrogate the states' immunity is simply incomprehensible).
 
 
 14
 If the district court decides, therefore, that Metra is an arm of Illinois for purposes of immunity in federal court, it is clear that this first exception to the general rule will not serve to abrogate Metra's immunity in this case. The court should therefore examine whether Illinois has expressly consented to suit.
 
 C.
 
 15
 The question of whether Illinois has consented to suit in federal court in this action is, again, a fact specific question that will need to be analyzed by the district court. A state, for example, may waive its Eleventh Amendment immunity by expressly stating, without leaving any room for any other reasonable construction, that it is subjecting itself to suit in federal court. Feeney, 495 U.S. at 305; Edelman v. Jordan, 415 U.S. 651, 673 (1974) (waiver only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction). This may be done in a state statute or constitutional provision. See Feeney, 495 U.S. at 306. Consent to suit in state court, however, will not waive Eleventh Amendment immunity. Id. While the cases that address this issue appear to support the proposition that actions taken on behalf of a State, such as appearing in court and defending on the merits, may, in some circumstances, indicate an express waiver of immunity for purposes of the Eleventh Amendment, see, e.g. Crosetto, 12 F.3d at 1403 n. 11 and Hankins v. Finnel, 964 F.2d 853, 856 (8th Cir.), cert. denied, 113 S.Ct. 635 (1992) and cases cited therein, such waivers must still meet the stringent requirements of Edelman, expressly indicating that the state wishes to waive its immunity by such action. Cf. Amisub (PSL) v. State of Colo. Dept. of Social Services, 879 F.2d 789, 793 (10th Cir.1989), cert. denied, 496 U.S. 935 (1990) (and cases cited therein). The plaintiff in this action will, therefore, need to point to some express provision or unequivocal conduct that demonstrates that the state of Illinois has expressly and unreservedly waived its Eleventh Amendment immunity in federal court. To the extent that plaintiff fails, his suit is barred in federal court for lack of subject matter jurisdiction.
 
 II.
 
 16
 Finally, if after its analysis the district court concludes that plaintiff's suit against Metra is not barred by the Eleventh Amendment, the district court should allow the parties additional opportunity to develop the record with regard to the question of our jurisdiction under Sec. 51 of FELA. Section 51 sets out what is essentially a two-part test for jurisdiction under FELA. First, the employer (Metra) must be a "common carrier by railroad while engaging in commerce between any of the several states ..." and, second, the injured employee (Strykowski) must be "employed by such carrier in such commerce...." 45 U.S.C. Sec. 51. Congress elaborated on the second prong of this test by amending the original section in 1939, adding:
 
 
 17
 Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.
 
 
 18
 While the parties in this case concentrated almost exclusively on the second prong of this test in their briefs to this court (no doubt because the district court used this prong as the basis of its dismissal in this case), we are nonetheless concerned that there may be a problem with the first prong as well. Because there is very little development of the record on the second prong and even less on the first, we reverse the decision of the district court and remand to allow the parties additional time to conduct discovery, submit additional briefs, or otherwise allow the district court to conduct further proceedings as he may deem appropriate to adequately expand the jurisdictional record. After the parties have been given their opportunity, the district court should again rule on the question of plaintiff's jurisdiction under Sec. 51 of FELA and enter those findings supporting its conclusion.
 
 A.
 
 19
 In making its findings on the first prong, the district court should consider each of the separate elements that make up this portion of the test: (1) whether Metra is a "railroad" within FELA, and if so (2) whether Metra ia a "common carrier," and finally (3) whether Metra is "engaged in interstate commerce" within the Act. Plaintiff must show facts demonstrating that Metra meets each element of this part of the test before jurisdiction will attach. We address each of these elements in order.[4] Cf. Pickney v. Oro Dam Constructors, 441 F.2d 806, 807 (9th Cir.), cert. denied, 404 U.S. 867 (1971).
 
 1.
 
 20
 We turn first to Metra's status as a railroad under FELA. It is well-settled, since the earliest days of the Act, that street railway companies (as opposed to ordinary railroads) do not come within the purview of FELA. See McKenna v. Washington Metro. Area Transit Auth., 670 F.Supp. 7, 9 (D.D.C.1986), aff'd, 829 F.2d 186 (D.C.Cir.1987) (identifying a long-recognized exception within FELA for "street railways"); see also Washington Ry. & Elec. Co. v. Scala, 244 U.S. 630, 637-38 (1917) (stating that ordinary railroad, as distinguished from street railway company, came within FELA); Mangum v. Capital Traction Co., 39 F.2d 286, 287 (D.C.Cir.1930) (stating that street railways are not included within the classification of "common carriers by railroad" as used in FELA). The distinction between a street railway and an ordinary railroad has been explained more in terms of the functions and services performed by the railroad and less in terms of the tracks or equipment used. For example, in Omaha & Council Bluffs Street Railway Co. v. Interstate Commerce Com'n, 230 U.S. 324, 335-36 (1913), the Supreme Court, interpreting the Interstate Commerce Act of 1887, stated that
 
 
 21
 ordinary railroads are constructed on the companies' own property. The tracks extend from town to town and are usually connected with other railroads, which themselves are further connected with others, so that freight may be shipped, without breaking bulk, across the continent. Such railroads are channels of interstate commerce. Street Railroads, on the other hand, are local, are laid in streets as aids to street traffic, and for the use of a single community, even though that community be divided by state lines, or under different municipal control. When these street railroads carry passengers across a state line they are, of course, engaged in interstate commerce, but not the commerce which Congress had in mind when legislating in 1887. Street railroads transport passengers from street to street, from ward to ward, from city to suburbs, but the commerce to which Congress referred was that carried on by railroads engaged in hauling passengers or freight "between States," ...
 
 
 22
 This distinction has since been applied to actions under FELA. See, e.g., Ferguson v. Philadelphia Trans. Co., 205 F.2d 520, 520 (3d Cir.), cert. denied, 346 U.S. 867 (1953) (holding that the Philadelphia Transportation Co. was not a railroad within the meaning of FELA, but rather a street railway operating a local passenger transportation system on, over, and under the streets of the city of Philadelphia and the adjacent urban area of its metropolitan district); accord Mangum, 39 F.2d at 287-88.[5] In addition, in spite of changes that have taken place in modern urban transportation since the time that the Supreme Court wrote Omaha, at least one court has recently held that urban rapid transit systems are within the tradition of the street railway, and are therefore not covered under FELA. See Felton v. Southeastern Pennsylvania Trans. Auth., 952 F.2d 59, 62 (3d Cir.1991) (holding that the Southeastern Pennsylvania Transportation Authority's ("SEPTA") City Transit Division ("CTD") is not within the coverage of FELA, affirming its prior decision in Ferguson which held that the Philadelphia Transportation Co., predecessor of the CTD, was a street railway outside the scope of the Act).[6] Metra's status as an urban rapid transit system, therefore, should be carefully analyzed in light of this distinction to determine whether it, too, falls outside the scope of FELA, or should be considered an ordinary railroad within the Act.[7]
 
 2.
 
 23
 If the district court finds that Metra is a railroad within FELA, it should next consider whether Metra is a common carrier under the Act. Several cases have specifically analyzed this element when considering whether a railroad falls within the scope of FELA. See, e.g., Kieronski v. Wyandotte Terminal R. Co., 806 F.2d 107, 108 (6th Cir.1986); Aho v. Erie Mining Co. 466 F.2d 539, 540 (8th Cir.1972); McCrea v. Harris County Houston Ship Channel Nav. Dist., 423 F.2d 605, 608 (5th Cir.), cert. denied, 400 U.S. 927 (1970); Lone Star Steel Co. v. McGee, 380 F.2d 640, 647 (5th Cir.), cert. denied, 389 U.S. 977 (1967).[8] For purposes of FELA, a "common carrier" has been defined as
 
 
 24
 one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant.
 
 
 25
 Kieronski, 806 F.2d at 108 (quoting Kelly v. General Electric Co., 110 F.Supp. 4, 6 (E.D.Pa.), aff'd, 204 F.2d 692 (3d Cir.), cert. denied, 346 U.S. 886 (1953)); see also Edwards, 390 U.S. at 540 (the words "common carrier by railroad" mean one who operates a railroad as a means of carrying for the public--that is, a railroad company acting as a common carrier). While this element of the first prong is not a significant hurdle, the district court should nonetheless analyze this factor and make the appropriate determinations with regard to it.
 
 3.
 
 26
 Finally, if the case reaches this point, the district court will need to consider whether Metra is "engaged in interstate commerce" under FELA.[9] This is probably the most obtuse element of the first prong, but the cases reveal a fairly practical and consistent distinction drawn between admittedly local operations and those which are an integral step in a continuous interstate journey. This, even more than the previous inquiries, is a comparison of facts and cases. We will set out a sampling below in order to draw attention to some of the boundaries recognized in the cases.
 
 
 27
 The central question here is whether the employer is a participant in a continuous interstate journey of persons or freight. It is undisputed that the employer may be wholly intrastate but nevertheless engaged in interstate commerce within the Act. See Kach v. Monessen Southwestern Ry. Co., 151 F.2d 400, 401 (3d Cir.1945); see also United States v. Yellow Cab Co., 332 U.S. 218, 228 (1947), overruled on other grounds, Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984) (overruling intra-enterprise conspiracy doctrine under the Sherman Act); The Daniel Ball, 10 Wall 557, 565-66 (1870). Those wholly intrastate activities must, however, be an integral part of a continuous movement of goods or passengers across state lines. See Kach, 151 F.2d at 401, 402 (wholly intrastate carrier who takes part with other carriers in the continuous movement of freight across state lines becomes a participant in interstate commerce under FELA); see also Yellow Cab, 332 U.S. at 229 (intrastate taxi ride between railroad stations in Chicago, contracted for in advance as part of interstate travel arrangements, were an integral step in the interstate movement); Philadelphia & Reading Ry. Co. v. Hancock, 253 U.S. 284, 286 (1920) (intrastate movement was in interstate commerce when there was no interruption of movement and the goods always continued toward points as originally intended); McCluskey v. Marysville & Northern Ry. Co., 243 U.S. 36, 40 (1917) (journey constitutes interstate commerce when article is committed to a carrier for transportation to the state of its destination, or started on its ultimate passage); Merchants Fast Motor Lines, Inc. v. Interstate Commerce Com'n, 528 F.2d 1042, 1044 (5th Cir.1976) (traffic that does not physically cross state lines is nevertheless in interstate commerce if the goods carried are in the course of through transit).
 
 
 28
 Probably the best description of the distinction between a continuous journey in interstate commerce and a journey of mere local concern was laid out in Yellow Cab. While Yellow Cab concerned the Sherman Act and not FELA, its reasoning has been applied in this context. Cf. Estate of Zaritz v. Manitou & Pikes Peak Ry. Co., 604 F.2d 652, 656-57 (10th Cir.1979) (applying Yellow Cab in context of FELA). In Yellow Cab, the Supreme Court held that contracts to carry train passengers by taxicab between railroad terminals in Chicago were "clearly a part of the stream of interstate commerce." Yellow Cab, 332 U.S. at 228. The Court reasoned that this taxi ride between train stations in Chicago was merely one step in an interstate journey where passengers "move from a point of origin in one state to a point of destination in another." Id. The Court stated that this wholly intrastate activity "must be viewed in its relation to the entire journey rather than in isolation. So viewed, it is an integral step in the interstate movement." Id. at 229. On the other hand, taxi rides from homes, offices, or hotels in Chicago to the train station at the beginning of or conclusion of an interstate journey by train were not considered to be in interstate commerce. Id. at 230. The Court reasoned that
 
 
 29
 such transportation is too unrelated to interstate commerce to constitute a part thereof.... These taxicabs, in transporting passengers and their luggage to and from Chicago railroad stations, admittedly cross no state lines; by ordinance, their service is confined to transportation "between any two points within the corporate limits of the city." None of them serves only railroad passengers, all of them being required to serve "every person" within the limits of Chicago. They have no contractual or other arrangement with the interstate railroads. Nor are their fares paid or collected as part of the railroad fares. In short, their relationship to interstate transit is only casual and incidental....
 
 
 30
 [I]nterstate commerce is an intensely practical concept drawn from the normal and accepted course of business. And interstate journeys are to be measured by "the commonly accepted sense of the transportation concept." ... We must accordingly mark the beginning and end of a particular kind of interstate commerce by its own practical considerations.
 
 
 31
 Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. Taxicab service is thus but one of many that may be used. It is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires. From the standpoints of time and continuity, the taxicab trip may be quite distinct and separate from the interstate journey. To the taxicab driver, it is just another local fare.
 
 
 32
 Id. at 230-32 (internal cites omitted);[10] cf. McCluskey, 243 U.S. at 38-39 (interstate commerce does not begin for purposes of FELA "until the articles have been shipped or started for transportation from one state to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence is no part of that journey.... Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain.' ") (quoting Coe v. Errol, 116 U.S. 517, 528 (1886)); Zaritz, 604 F.2d at 656 (out-of-state passengers' round-trip on the Pikes Peak Railway was not in furtherance of "through" transit in interstate character, but rather a "side excursion" and purely local); Merchants Fast Motor Lines, 528 F.2d at 1044 (goods are in interstate commerce when they are carried in the course of through transit); see also Hancock, 253 U.S. at 286 (coal was in the course on interstate commerce when it left the mine, since there was no interruption of the movement and coal always continued toward points as originally intended).
 
 
 33
 Using the principles outlined in the cases above, the district court in this case will need to determine whether Metra, specifically its intrastate rapid transit lines, can be considered to be engaging in interstate commerce. If not, plaintiff's suit against Metra must be dismissed unless plaintiff can demonstrate other activities engaged in by Metra that may be considered to be in interstate commerce.[11] If the district court decides that Metra is engaged in interstate commerce under FELA, each interstate activity should be separately identified so that plaintiff's duties (in furtherance of such interstate activities) may be examined in light of each.
 
 
 34
 As a final observation, we would ask the parties and the district court to take care that only Metra's activities are examined for purposes of this interstate commerce analysis. See Zaritz, 604 F.2d at 655 (plaintiff's concentration on the interstate nature of the persons who purchased tickets and used the Pikes Peak Railway, rather than the interstate character of the railways operations, was fatal flaw in plaintiff's case). Metra was plaintiff's employer for purposes of this action and therefore it is Metra, and not its passengers, other railroads, or other divisions of any larger parent organization, that must be engaged in interstate commerce in order for this action to continue. Cf. Felton, 952 F.2d at 64-66 (separate divisions of SEPTA were not single entity for purposes of imputing interstate character of one division to the other, where two divisions were not so physically integrated to be viewed as a single common carrier "engaging in commerce between any of the several states" under FELA).
 
 B.
 
 35
 We turn now to the second prong of the analysis under Sec. 51 of FELA. There is really only one inquiry here: whether plaintiff's duties as an employee of Metra in any way furthered any of Metra's interstate activities. The statutory language relevant to this analysis is contained in the 1939 amendment to the Act and reads as follows:
 
 
 36
 Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.
 
 
 37
 45 U.S.C. Sec. 51. While inquiries under this section will necessarily require a case-by-case examination, Reed v. Pennsylvania R. Co., 351 U.S. 502, 507 (1956), several cases have analyzed the scope of this language. For example, the Supreme Court in Reed, 351 U.S. at 505, 506 stated that
 
 
 38
 The test for coverage under the amendment is not whether the employee is engaged in transportation, but rather whether what he does in any way furthers or substantially affects transportation.... Under the amendment, it is the "duties" of the employee that must further or affect commerce, and it is enough if "any part" of those duties has the requisite effect. The statute commands us to examine the purpose and effect of the employee's function in the railroad's interstate operation, without limitation to nonclerical employees or determination on the basis of the employee's importance as an individual in the railroad's organization.
 
 
 39
 The Court then went on to discuss the factual situation before it and stated that the failure of the petitioner to adequately perform her job could
 
 
 40
 promptly cause delay, confusion, or worse in the day-to-day operation of respondents' lines. If all employees who perform petitioner's duties were removed from service, respondent could not conduct its operations without a change in its organizational system.... Proper performance of [petitioner's] duties makes an obvious contribution to the maintenance of [respondent's] system.
 
 
 41
 Id. at 506-07. Interpreting this language, the district court in Elston v. Consolidated R. Co., 762 F.Supp. 180, 184 (S.D.Ohio 1991), suggested that when examining an employee's function (as opposed to his or her position) within the organization, the trier of fact should examine whether "delay" and "confusion" would result in the employer's interstate activities if those duties were performed poorly or not at all, and whether the elimination of plaintiff's position (and all similar functions) would require a change in the employer's organizational structure.
 
 
 42
 A similar analysis was adopted in Holl v. Southern Pac. Co., 71 F.Supp. 21, 24-25 (N.D.Cal.1947). The court in Holl examined a series of cases on this subject and concluded that in each of them the plaintiff "was doing something which laid the foundation for, and was in aid of another or subsequent act of interstate commerce or a step towards it." Id. at 25. After examining plaintiff's duties as a clerk in the railroad's freight claim department, the court held
 
 
 43
 Whatever movement in interstate commerce the freight shipment,--as to which the claim for loss or damages was made,--had been part of, had already come to an end at the time the claim came to the department in which the plaintiff was employed. ... It was neither the conclusion of a movement in interstate commerce nor the beginning of another one. It was a separate and distinct activity, unconnected with transportation, and aiming at the liquidation of a claim relating to an interstate commerce movement which had already been fully completed.
 
 
 44
 Id. (emphasis in original). As support, Holl relied on a decision from this circuit, Shelton v. Thompson, 148 F.2d 1 (7th Cir.1945), in which a panel of this court stated that "[a] car cannot travel even in interstate commerce, without wheels" (referring to plaintiff's job repairing wheels on freight trains). The court in Holl cited this language as a convenient way to examine plaintiff's duties: whether the actual movement of trains in interstate commerce is in some way dependent on plaintiff's duties. Id.
 
 
 45
 While there are numerous cases on this issue covering every conceivable duty or job, we hope the parties will concentrate, for purposes of this analysis, on the factors discussed by the courts in the cases cited above. It is clear that Congress, in amending FELA in 1939 meant to substantially expand the coverage of this portion of the test and "obliterate fine distinctions as to coverage between employees." Reed, 351 at 505; Holl, 71 F.Supp. at 23. Congress did not mean, however, to cover all employees of interstate railroads. Straub v. Reading Co., 220 F.2d 177, 183 (3d Cir.1955); Holl, 71 F.Supp. at 23-24. The distinctions set out above should ensure that the employees Congress meant to cover are properly admitted.
 
 Conclusion
 
 46
 In sum, because the record in this case is insufficient to determine either the question of Metra's Eleventh Amendment standing or the question of our subject matter jurisdiction under FELA, we reverse the decision of the district court and remand for further proceedings. This order is painstakingly detailed in the hope that the court will permit the parties an opportunity to fully supplement the record so as to enable the court to resolve these difficult questions on a step-by-step basis.
 
 
 
 [1]
 The district court used as its factual basis for this determination an affidavit submitted by the plaintiff setting out a listing of his duties for Metra
 
 
 [2]
 More recently, the Supreme Court has held that the Commerce Clause may also serve as the basis for Congressional action abrogating a state's Eleventh Amendment immunity to suit. See Union Gas, 491 U.S. at 23
 
 
 [3]
 While there are numerous cases touching on this issue in this and other circuits, this small sampling may be helpful in considering the factors listed above
 
 
 [4]
 Our brief discussion of the test put forth in Sec. 51 and the various elements considered by various courts in determining the applicability of FELA to a particular case, is by no means an exhaustive treatment of this issue
 
 
 [5]
 The court in Mangum further discussed the distinction between street railways and commercial railroads
 A street railway in its inception is a purely urban institution. It is intended to facilitate travel in an about the city from one part of the municipality to another, and thus relieve the sidewalk of foot passengers and the roadway of vehicles. It is thus as aid to the exercise of the easement of passage; strictly a city conveyance, for the use of the city, by people living or stopping therein, and fully under the control of the municipal authorities, who have been endowed with ample power for that purpose. Speaking generally, then, a street railway is local, derives its business from the streets along which it is operated, and is in aid of the local travel upon those streets; while a commercial railway usually derives its business, either directly or indirectly, through connecting roads, from a large area of territory, and not from the travel on the streets of those cities, either terminal or way stations, along which they happen to be constructed and operated.
 Mangum, 39 F.2d at 287.
 
 
 [6]
 In addition, while not dealing with FELA, we note that this circuit has held that the Chicago Transit Authority ("CTA"), and urban rapid transportation systems of the type operated by the CTA, do not come within the definition of "railroad" for purposes of the Railroad Safety Act of 1970, 45 U.S.C. Secs. 421-41. Chicago Transit Authority v. Flohr, 570 F.2d 1305, 1308 (7th Cir. (1977) (emphasizing the common meaning of the word "railroad.")
 
 
 [7]
 We note also that Congress does not appear to have moved to amend or otherwise change the definition of "railroad" within the Act in order to incorporate street railroads or their modern equivalents. See Edwards v. Pacific Fruit Express Co., 390 U.S. 538, 541 (1968) ("By refusing to broaden the meaning of railroads, Congress declined to extend the coverage of the Act to activities and facilities intimately associated with the business of common carrier by railroad."); Felton, 952 F.2d at 62-64 (reviewing congressional legislation subsequent to FELA and determining that these do not evince an intent to subject intraurban rail transportation to reaches of FELA, but rather evince an intent to differentiate between these and ordinary interstate railroads)
 
 
 [8]
 These cases concern various in-plant railroads, private carriers, or linking carriers, see Kieronski, 806 F.2d at 109 (and cases therein), and therefore discussed whether these railroads had sufficiently held themselves out as carrying for the public as common carriers
 
 
 [9]
 We note at this point the difference between the terms "affect interstate commerce" and "engaged in interstate commerce." Estate of Zaritz v. Manitou & Pikes Peak Ry. Co., 604 F.2d 652, 657 (10th Cir.1979). To "engage" in interstate commerce is much narrower in scope and requires that the employer's own activities be in interstate commerce. To "affect" interstate commerce, on the other hand, requires no direct participation by the employer. Cf. id. (distinguishing cases employing "affect" language as inappropriate authority to decide scope of "engaging in" interstate commerce under FELA). Congress, in Sec. 51 of FELA, chose the language "engaging in" and therefore Metra's own activities must be in interstate commerce, not merely affecting it, in order to come within the scope of FELA
 
 
 [10]
 See also Evanston Cab Co. v. City of Chicago, 325 F.2d 907, 912 (7th Cir.1963)
 
 
 [11]
 For example, in addition to its five commuter rail lines, Metra also appears to engage in activates related to maintaining the facilities, track, and equipment owned by the Commuter Rail Division ("CRD"). There may be other activities similar in nature that the parties may want to explore (for example, whether Metra provides security for other interstate railroads). Whether these additional activities are in interstate commerce will need to be addressed on a case-by-case basis. The cases that we have examined, however, are not very helpful in this regard. We nevertheless mention several as a starting point: Overstreet v. North Shore Corp., 318 U.S. 125, 128-29 (1943) (employee's work maintaining tracks used by interstate trains and hence indispensable to interstate commerce, came within FELA), Miller v. Central R. Co. of New Jersey, 58 F.2d 635, 637-38 (2d Cir.), cert. denied, 287 U.S. 617 (1932) (deceased was engaged in interstate commerce when maintaining track used in both intrastate and interstate commerce, but railroad station was not interstate in character since not used for transportation), and Hedderman v. Staten Island Rapid Transit Operating Authority, 593 F.Supp. 1141, 1144-45 (E.D.N.Y.1984) (reasoning that operating authority's grant of trackage rights to Staten Island Rapid Transit ("SIRT") for use in the latter's freight operation brought the operating authority within FELA)